**L.B. KAYE ASSOCIATES,
LTD., Plaintiff,**

v.

**JEWS FOR JESUS and Hineni
Ministries, Defendants.**

**No. 85 Civ. 6049(CBM).**

United States District Court,
S.D. New York.

Jan. 7, 1988.

George P. Leshanski, New York City, for plaintiff.

Wisehart & Koch, New York City by Jay Alan Sekulow, for defendants.

MOTLEY, District Judge.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff, L.B. Kaye Associates, Ltd. (L.B. Kaye), brings this diversity action against defendants, Jews for Jesus and Hineni Ministries (Jews for Jesus), for breach of a brokerage agreement. Plaintiff is a New York corporation and a licensed real estate broker. At all times relevant to this action, Hineni Ministries was a California corporation doing business in New York as Jews for Jesus. L.B. Kaye alleges that Jews for Jesus owes it a $30,000 brokerage commission pursuant to an oral agreement. Jews for Jesus claims that pursuant to an allegedly superseding written agreement, it was excused from the obligation to pay the commission. A bench trial was held on May 18–19, 1987, and the court now rules in favor of plaintiff. Pursuant to Fed.R. Civ.P. 52, the court states the following findings of fact and conclusions of law.

### FINDINGS OF FACT

Late in 1981 or early in 1982 the Irish Institute, Inc. employed L.B. Kaye to assist it in selling a building located at 326 West 48th Street in New York City. Shortly thereafter, one of L.B. Kaye's agents, Theodore Handerek, showed the building to two representatives of Jews for Jesus, Baruch Goldstein and Moishe Rosen. Between March and May of 1982, Jews for Jesus and the Irish Institute reached an agreement whereby defendants would purchase

the building for $500,000 and pay a 6% brokerage commission to L.B. Kaye.

After reaching this agreement, Jews for Jesus and L.B. Kaye agreed orally that defendants would pay L.B. Kaye a $30,000 commission. [Pretrial Order, Undisputed Fact (v)] At trial, Goldstein testified that the parties discussed when the commission would be due. [Tr. 91] He also said that they did not discuss the issue of willful default. [Tr. 92–93] Rosen testified that his understanding was that Jews for Jesus "would pay 6% commission upon the purchase of the building." [Tr. 140] Handerek testified that the parties did not discuss what would happen if Jews for Jesus and the Irish Institute failed to close title. [Tr. 35] The court infers from this testimony that the parties orally agreed that the 6% commission would be due upon the closing of title but that they discussed no further details.

On April 30, 1982, L.B. Kaye delivered to Jews for Jesus a standard form letter "confirming" the oral commission agreement. [Tr. 121, Pretrial Order, Undisputed Fact (vi)] The letter, written by plaintiff and signed by its president, included the terms of the oral agreement as well as additional terms that would have been implied in law in the absence of a written agreement. It provided that Jews for Jesus was to pay L.B. Kaye a brokerage fee of $30,000. The letter also stated:

> The aforesaid commission shall be payable by yourself to L.B. Kaye Associates, Ltd., as procuring brokers if and when title closes except in the event of your willful default, in which case said commission shall be due and payable notwithstanding the fact that title has not closed.

On May 10, 1982, Rosen struck all the words following "except" and placed a period after "if and when title closes." The paragraph thereafter read:

> The aforesaid commission shall be payable by yourself to L.B. Kaye Associates, Ltd., as procuring brokers if and when title closes. ~~except in the event of your willful default, in which case said commission shall be due and payable notwith-~~ ~~standing the fact that title has not closed.~~

Rosen then initialed the modification, and signed the letter. Jews for Jesus returned the letter, as modified, to plaintiff, who did not communicate further about it with defendants.

At the same time that Rosen signed the modified letter, Jews for Jesus entered into a contract to purchase the aforementioned building from the Irish Institute. The contract stated that the purchaser would pay any brokerage fee provided for in a "separate agreement." In addition, Section 7(a) of the contract said:

> This agreement is subject to a satisfactory engineer's report and a satisfactory termite inspection report with respect to the condition of the premises. If either report is unsatisfactory to the purchaser, the purchaser shall have the right to cancel the agreement by written notice to the seller and to receive from seller the refund and payment described in paragraph 22 of this agreement.

Paragraph 22 of the contract required that defendant pay the Irish Institute a $50,000 down payment to be held in escrow by the Institute's attorney. Title was scheduled to close on August 13, 1982.

The closing was adjourned from August 13 until August 17, 1982 at the request of Jews for Jesus. [Tr. 23] On August 15, Jews for Jesus' attorney, David Fuller, informed counsel for the Irish Institute, Paul O'Dwyer, that Jews for Jesus did not intend to proceed with the purchase of the building. Fuller offered no reason for the refusal to close. [Tr. 24] On August 16, O'Dwyer delivered a letter to Fuller confirming the August 17 closing date and indicating that if Jews for Jesus failed to pay the balance due on the contract, the Irish Institute would "hold them responsible for any and all losses occasioned by their failure to live up to their contractual obligations...." On August 17, the Irish Institute was ready, willing and able to deliver title to Jews for Jesus. Jews for Jesus failed to appear at the scheduled closing.

On September 2, 1982, plaintiff commenced an action in the Supreme Court of the State of New York, County of New York, to recover its brokerage commission. [Affidavit of Ted Handerek, ¶ 24 (May 9, 1986)] This proceeding was eventually dismissed on procedural grounds.

Approximately one week after having been served with plaintiff's complaint in the state court proceeding, new counsel for Jews for Jesus attempted to explain the refusal to close. In a letter to O'Dwyer, counsel for Jews for Jesus claimed for the first time that Jews for Jesus had received an unsatisfactory engineer's report and for this reason had exercised its right pursuant to Section 7(a) of the contract to rescind the purchase and sale agreement. Although the letter to O'Dwyer also demanded return of the down payment, the down payment has never been returned. Jews for Jesus nevertheless gave the Irish Institute a quit claim deed to the property in November 1982. [Tr. 25] Since then, the Irish Institute sold the building to another purchaser and Jews for Jesus purchased another property for 1.6 million dollars. [Tr. 155]

## CONCLUSIONS OF LAW

### 1. The Arguments of the Parties

Both parties offer two-pronged arguments in defense of their respective positions. L.B. Kaye first argues that the oral brokerage commission agreement remains binding on Jews for Jesus. Plaintiff also says that its right to the commission accrued as a matter of law when Jews for Jesus executed the contract of sale, even if actual payment was deferred until closing. Because the right vested on May 10, 1982, Jews for Jesus cannot rightfully refuse to pay the $30,000 commission, irrespective of its reasons for refusing to close.

Should the court reject this argument, L.B. Kaye next contends that the confirmatory letter was a mere memorialization of the oral agreement, not a superseding written agreement. On this interpretation, Goldstein's attempt to strike a material provision of the contract was an effort unilaterally to modify that contract without consideration, and as such it was without effect. Moreover, L.B. Kaye never agreed to the modification, and its silence cannot be construed as assent. L.B. Kaye argues that the terms of the letter, as originally drafted, memorialize an oral agreement that entitles it to receive its commission in the event that Jews for Jesus willfully defaults. Plaintiff says that Jews for Jesus willfully refused to close, that its belated reference to the engineer's report was merely a "convenient afterthought," and that L.B. Kaye is therefore entitled to receive its commission.

In response, Jews for Jesus first argues that the letter, not the oral agreement, establishes the legal rights and obligations of the parties. Jews for Jesus claims that it never agreed to the clause that it endeavored to strike from the letter, and that L.B. Kaye's attempt to introduce the new term establishes that plaintiff was offering a superseding agreement. Jews for Jesus contends that by striking and initialing the change, it was making a counter-offer to plaintiff, and that consideration for the new contract may be found in the parties' mutual relinquishment of their rights pursuant to the oral agreement. Plaintiff's failure to respond after receiving the modified letter constituted assent to Jews for Jesus' counter-offer, which excused it from any obligation to pay the commission if for *any* reason title did not close.

In the alternative, should the modification be found void, Jews for Jesus argues that it did not willfully refuse to close title. It says that it was excused from performance of the contract by its receipt of an unsatisfactory engineer's report. It says that it complied with the terms of Section 7(a) of the contract in exercising its right to rescind the purchase agreement, and that it therefore cannot be held liable for payment of the brokerage commission.

### 2. The Oral Agreement

█ At the outset, the court notes that if L.B. Kaye had never sent Jews for Jesus the confirmatory letter, the oral agreement would have been enforceable. The parties stipulated in their Joint Pre–Trial Order to

the existence of the oral brokerage agreement, and Jews for Jesus' apparent efforts in post-trial submissions to undermine the force of that stipulation are of no effect. The parties expressly agreed on the only essential terms—the obligation of Jews for Jesus to pay the commission and its amount. Jews for Jesus cannot now introduce ambiguity into this contract, and thereby cast doubt on its enforceability, by arguing that the parties unknowingly harbored different assumptions about nonessential terms they never discussed. The fact that these differing assumptions were revealed by subsequent events in no way vitiates the validity of the original agreement.

Plaintiff first argues that its right to the commission vested upon execution of the contract of sale by the Irish Institute and Jews for Jesus. Under New York law, when an oral brokerage contract does not establish otherwise, the broker earns his or her commission when he or she locates a buyer ready, willing, and able to purchase at the terms set by the seller. *See Nuvest, S.A. v. Gulf & Western Industries, Inc.,* 649 F.2d 943, 947 (2d Cir.1981); *Lane—The Real Estate Department Store, Inc. v. Lawlet Corp.,* 28 N.Y.2d 36, 42, 319 N.Y.S.2d 836, 840, 268 N.E.2d 635, 638 (1971); *Wagner v. Derecktor,* 306 N.Y. 386, 390, 118 N.E.2d 570, 572 (1954). "At the moment the broker procures an acceptable purchaser with whom the seller agrees on essential terms, the broker has fully performed his portion of the brokerage agreement and his right to a commission becomes enforceable." *Stiefvater Real Estate, Inc. v. Hinsdale,* 812 F.2d 805, 807 (2d Cir.1987) (citing *Hecht v. Meller,* 23 N.Y.2d 301, 305, 296 N.Y.S.2d 561, 563, 244 N.E.2d 77, 78 (1968); *Williamson, Picket, Gross, Inc. v. Hirschfeld,* 92 A.D.2d 289, 293, 460 N.Y.S.2d 36, 39 (1st Dep't 1983)). This principle implies that if the oral agreement between the parties had been the only agreement relevant to their dispute, and if the parties had not determined when plaintiff was to earn its commission, L.B. Kaye would have become entitled to its commission upon execution of the contract of sale, as plaintiff claims. *See Levy v. Lacey,* 22

N.Y.2d 271, 274, 292 N.Y.S.2d 455, 457, 239 N.E.2d 378, 379–80 (1968); *Mulvihill v. Di Prima,* 47 A.D.2d 560, 560, 363 N.Y.S.2d 629, 630 (2d Dep't 1975).

For two reasons, however, the court cannot immediately conclude that plaintiff's right to its commission accrued upon execution of the contract of sale. First, the court has determined that the parties in this case did in fact discuss when plaintiff's right to a commission would vest. Credible testimony revealed that the parties agreed that the commission would be due and payable upon closing of title. This conclusion is reinforced by the terms of the confirmatory letter of April 30, 1982, which plaintiff insists constituted nothing more than a memorialization of the terms of the oral agreement (with the expression of additional terms that would otherwise have been implied in law). "[L]anguage in a brokerage agreement [indicating that a commission is to be paid upon the closing of title] imports also the notion that closing of title is a condition precedent to the broker's being entitled to a commission." *Levy v. Lacey,* 22 N.Y.2d at 274–75, 292 N.Y.S.2d at 458, 239 N.E.2d at 380; *see Amies v. Wesnofske,* 255 N.Y. 156, 161–62, 174 N.E. 436, 437–38 (1931). Plaintiff's right to a commission did not vest upon execution of the contract of sale because the parties agreed it would vest upon closing.

Moreover, the court cannot discount without further discussion Jews for Jesus' contention that the letter was not merely a memorialization, but in fact served as a substitute and superseding offer by the plaintiff. If the letter can be interpreted as a substitute contract, the terms of which, as modified by Jews for Jesus, are binding on the parties, then plaintiff's right to a commission will never have vested. The altered letter excused Jews from Jesus from paying the commission if title failed to close, irrespective of the cause of that failure. The following analysis reveals the legal status of the letter.

*3. The Legal Status of the Confirmatory Letter*

■ The court recognizes that the April 30 letter contained only those terms that

the parties had orally agreed to include in the brokerage contract *plus* terms that, *in the absence of any express agreement to the contrary,* would have been implied in law. The parties had agreed upon the amount of the commission and the date upon which it would become due and payable. If the parties had never addressed any other terms of the agreement, New York law would have required payment of the commission, even if title never closed, if the failure to close was due to willful default by Jews for Jesus. *See Wagner v. Derecktor,* 306 N.Y. at 391, 118 N.E.2d at 572–73. The letter, supposing that it had been accepted in full by Jews for Jesus, would have imposed no obligation on Jews for Jesus that it would not already have been bound to fulfill pursuant to the oral agreement. From this perspective, the letter appears to be merely a memorialization of terms that L.B. Kaye understood to be included, either expressly or impliedly in law, in the oral agreement.

On the other hand, the court cannot ignore the fact that the letter explicitly added a term that the oral agreement had not addressed. At the time the parties reached their oral agreement, there simply had been no meeting of the minds on the issue of willful default. Although Jews for Jesus would have been obliged to pay the commission if it willfully refused to close, had the plaintiff *not* sent the letter, the court cannot infer that Jews for Jesus was obliged to accept the implied term once the plaintiff expressed it in so many words. Parties to a contract are free to alter terms that, in the absence of express provisions, would be implied in law. A clear agreement excusing Jews for Jesus from paying the commission, even if failure to close were due to its own default, would be enforceable. *Levy v. Lacey,* 22 N.Y.2d at 274, 292 N.Y.S.2d at 457, 239 N.E.2d at 380; *Wagner v. Derecktor,* 306 N.Y. at 390–91, 118 N.E.2d at 572–73. When the letter is viewed as an attempt to reach an explicit understanding where none previously existed, it appears as an attempt to substitute a second more comprehensive express agreement.

Adopting the first interpretation of the letter—as a mere memorialization—would compel the court to find that Jews for Jesus' attempted modification was without consideration and, therefore, without effect. Quite apart from the problems involved in an attempt *unilaterally* to modify an existing agreement, such a "contract cannot be altered [even] by mutual assent by an agreement merely to give one party a right or privilege, or to subject the other party to a burden which he did not previously have." 15 *Williston on Contracts* § 1826, at 487 (3d ed. 1972). The existing oral agreement would have been interpreted to require Jews for Jesus to pay the commission if it willfully refused to close title. The attempted alteration would have modified the existing contract only by giving Jews for Jesus the right to default with impunity. L.B. Kaye would have received nothing in consideration for relinquishing its right to sue for its commission upon Jews for Jesus' willful default, so the modification would be unenforceable.

■ Adopting the second interpretation of the letter—as a proposed substitute contract—would force the court to the same conclusion. Even if L.B. Kaye's silence upon receipt of the modified letter were treated as acquiescence to Jews for Jesus' counter-offer, the new contract would be without consideration. *See id.* Because "a new contract of substitution ... must be established in the same way as is any other contract," 6 *Corbin on Contracts* § 1293, at 188 (1962), the failure to establish consideration defeats the (modified) written agreement. The same reasoning that precluded enforcement of the attempted modification of the letter, regarded as a memorialization of the oral contract, precludes enforcement of the terms of the modified letter, construed as a substitute contract.

■ Moreover, the letter is unenforceable as a substitute agreement for a second reason. The letter as originally drafted obviously cannot be found to constitute a properly executed contract. Jews for Jesus' attempt to modify the terms of the letter indicated that it rejected those terms. The altered letter therefore represented

Jews for Jesus' counter-offer to L.B. Kaye, which in turn required an unambiguous acceptance. *See Koufman v. International Business Machines Corp.*, 295 F.Supp. 784, 788 (S.D.N.Y.1969) (noting that acceptance must be positive and unambiguous); *Josephine & Anthony Corp. v. Horwitz*, 58 A.D.2d 643, 642, 396 N.Y.S.2d 53, 54 (2d Dep't 1977) (stating that modified agreement constituted counter-offer). Because L.B. Kaye never communicated with Jews for Jesus about the counter-offer, however, the altered letter can be understood as a binding agreement (presuming there were consideration) only if L.B. Kaye's silence constituted assent.

Under New York law, absent a duty to speak, silence is generally not deemed to constitute acceptance of an offer, unless the effect of silence is to mislead the other party. *See Karlin v. Avis*, 457 F.2d 57 (2d Cir.), *cert. denied*, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972); *Albrecht Chem. Co. v. Anderson Trading Corp.*, 298 N.Y. 437, 440, 84 N.E.2d 625, 626 (1949). Jews for Jesus argues that L.B. Kaye's silence was misleading because plaintiff made no attempt to resolve the disagreement between the parties "until after such time that it could conceivably contend that defendants had committed a willful default on the sales contract which might entitle plaintiff to recover a commission...." Defendants' Post–Trial Proposed Conclusions of Law, at 4. The court cannot accept this interpretation of what counts as "misleading."

Jews for Jesus' argument effectively reverses the prevailing presumption against acquiescence by silence. If the failure of a counter-offeree to resolve patent disagreements between the terms of a counter-offer and those of the original offer counts, without more, as misleading the counter-offeror in such a way as to estop denial of acceptance, then the counter-offeror has effectively acquired an obligation to answer every counter-offer. The counter-offeree has no such obligation. "[I]f one who has received an offer makes a counter-offer, the mere silence of the original offeror is not operative as an acceptance of the counter-offer." 1 *Corbin on Contracts* § 74, at 312 (1963). The only conclusion Jews for Jesus could reasonably have drawn from its failure to receive further communication from plaintiff was that upon receiving the counter-offer, L.B. Kaye simply abandoned its effort to put the existing contract in writing, thereafter relying on the less easily proven oral agreement. Because there were no relations between the parties or other cicumstances that would have justified Jews for Jesus in expecting a reply, L.B. Kaye's silence may not be deemed misleading. *See* 1 *Williston on Contracts* § 91 (detailing the four situations, none of which applies to this case, in which silence or inaction may be deemed assent).

In sum, two circumstances preclude interpreting the altered letter either as a modification of the oral agreement or as a substitute contract. First, there was no consideration for the modification or substitution. Second, even if there had been adequate consideration, L.B. Kaye never assented to Jews for Jesus' counter-offer.

### 4. The Right to a Commission

Because the confirmatory letter cannot be construed as a binding agreement, the rights of the parties remain defined by the terms of the oral agreement. "No one will be held to have surrendered or modified any of his contract rights unless he is shown to have assented thereto in a manner that satisfies the requirements of a valid contract." 6 *Corbin on Contracts* § 1293, at 188. The circumstances of this case clearly show that L.B. Kaye had no intention of relinquishing its rights pursuant to the oral agreement, and even if it had, the duties imposed by that agreement could not be discharged unless the substitute contract were found valid.

■ As this court noted above, the oral agreement provided that plaintiff would be entitled to a 6% commission upon closing of title. The parties agree that title never closed. They also agree that at the time they entered the oral agreement, they did not discuss whether plaintiff would be entitled to its commission if failure to close was due to Jews for Jesus' willful default. Because the oral agreement does not ex-

pressly cover this contingency, plaintiff's right under the present circumstances is determined by New York law. The relevant law holds that a broker is entitled to receive a promised commission even if a condition precedent to payment is not satisfied, if failure to satisfy that condition is due to the defendant's own wrong. *See Levy v. Lacey*, 22 N.Y.2d at 276, 292 N.Y.S. 2d at 459, 239 N.E.2d at 381; *Wagner v. Derecktor*, 306 N.Y. at 391, 118 N.E.2d at 573.

■ The only remaining question, therefore, is whether Jews for Jesus willfully refused to close title. Jews for Jesus argues that its default was legitimately based upon its receipt of an unsatisfactory engineer's report. It contends that it justifiably exercised its right to cancel the purchase pursuant to Section 7(a) of the contract of sale.

The court is not persuaded by Jews for Jesus' attempt to justify its default. Five separate kinds of considerations convince the court that the appeal to the engineer's report is nothing more than a post hoc rationalization of willful failure to close. 1) Jews for Jesus initially offered absolutely no reason for its announced intention not appear at the closing on August 17. If it were genuinely dissatisfied with the engineer's report, it had ample time, prior to the scheduled date of closing, to inform the Irish Institute of its intention to cancel the purchase pursuant to Section 7(a) of the contract. 2) The explanation it now offers was not communicated until after L.B. Kaye sued for its commission in state court and this explanation was delivered only by new counsel hired to defend the suit. 3) Goldstein's testimony at trial regarding its reason for refusing to close directly contradicted Goldstein's testimony during a deposition taken much closer in time to the actual events in question. At the deposition, Goldstein never even mentioned the engineer's report as an explanation for Jews for Jesus' failure to appear at the closing. 4) Goldstein's testimony at trial about receipt of the engineer's report and the subsequent actions taken by Jews for Jesus was so confused and inconsistent as to be wholly worthless. Rosen's claim that Jews for Jesus refused to close because the cost of repairing the defects in the building exceeded its $600,000 budget [Tr. 159] was not credible in light of his further admissions that he never even asked the Board of Directors to reconsider this budget [Tr. 158] and that Jews for Jesus subsequently paid 1.6 million dollars—more than three times the cost of the building owned by the Irish Institute—for another building that also was not in move-in condition. [Tr. 155–56] 5) Jews for Jesus' willingness to give the Irish Institute a quit claim deed, despite the Institute's failure to return the $50,000 down payment, is not consistent with Jews for Jesus' position that it rightfully rescinded the contract. The action suggests that Jews for Jesus recognized that it had no right to insist that the lien remain upon the premises. For all these reasons, the court concludes that Jews for Jesus willfully defaulted on the purchase, and that it therefore owes plaintiff the $30,000 commission originally promised in the oral brokerage agreement.

## CONCLUSION

The rights and obligations of the parties to this action are governed by an oral brokerage agreement that entitles plaintiff to a $30,000 commission. Although the right to payment was to vest only upon closing of title, New York law entitles L.B. Kaye to recover its commission if failure to close was due to Jews for Jesus' willful default. The court has determined that Jews for Jesus willfully refused to close title. Jews for Jesus is therefore liable to L.B. Kaye for the sum of $30,000, together with interest, costs and disbursements of this action. 28 U.S.C. § 1920.