Manuel M. KOUFMAN, Plaintiff,

v.

INTERNATIONAL BUSINESS MA-
CHINES CORPORATION, Benderson
Development Company, Inc. and Jack
Chesbro, Defendant.

No. 66 Civ. 907.

United States District Court
S. D. New York.

Feb. 4, 1969.

Gilbert, Segall & Young, New York City, for plaintiff; Robert Layton, Elihu Inselbuch, New York City, of counsel.

Cravath, Swaine & Moore, New York City, for defendant International Business Machines Corporation; Alan J. Hruska, Richard M. Sharfman, New York City, of counsel.

WYATT, District Judge.

This is a motion by defendant International Business Machines Corporation (IBM) for summary judgment in its favor as to the claim contained in count I of the complaint. Fed.R. Civ.P. 56(b).

The action was commenced in this Court on March 29, 1966. There are three claims in the complaint set out in three separate counts. There are three defendants. Count I is directed against IBM alone, count II against the other two defendants, and count III against IBM alone.

Jurisdiction as to count I is asserted by reason of diversity of citizenship. 28 U.S.C. § 1332. Plaintiff Koufman is said to be a "resident" of Massachusetts. This is not a proper averment of citizenship but for present purposes it will be assumed that he is a citizen of Massachusetts. The citizenship of IBM in New York is properly averred.

Plaintiff has demanded trial by jury.

The averments of count I are in substance that about June 25, 1963, Koufman and IBM made a written contract under which Koufman agreed to develop a tract of land in Cranford, New Jersey (including apparently the construction of a building on the land) and to lease to IBM "the building constructed on said land", with an option to IBM to buy the land and building; and that IBM broke the contract to the damage of Koufman. The obligations of IBM under the contract are not stated but one such may be assumed to have been that IBM would lease a building from Koufman. The complaint avers that after making the June 25, 1963 contract with Koufman, IBM notified him that it had made a contract with someone else for development of a tract in Cranford.

Material facts as to which there is no genuine issue require that the motion of IBM be granted. Three propositions of law are established by the undisputed facts. There was never any agreement between the parties because IBM never accepted any offer of Koufman. If there was any agreement by IBM, it was not capable of enforcement because it was not sufficiently definite. Even if it was sufficiently definite, the claimed agreement would be bad under the statute of frauds.

IBM wanted to arrange for some outside investor to buy a specific tract of land (about 6 acres) in Cranford, to erect a building on the land from plans and specifications done by an architect for IBM, and then to make a lease of all or part of the building to IBM.

A deal was worked out by IBM with Benderson Development Company, Inc., one of the defendants in the second count, under which Benderson bought the land and agreed that if Benderson itself did not become the investor to erect the building then Benderson would sell the land to the investor to whom the "building" was "awarded" by IBM.

Under date of May 23, 1963, Daly (in the Real Estate Department of IBM) sent to a number of possible investors, including plaintiff Koufman, an invitation to submit "a proposal for the construction and leasing to IBM of the proposed building".

The proposal was to be on a form supplied by IBM. "General Conditions for Proposal" were sent also, as a memorandum of the same date (May 23, 1963). The estimated costs of land and building were given, the length of the lease to be taken, and other information. As to the "form" of lease to be taken by IBM it was stated: "Standard IBM form will be used as applicable". With respect to taxes and insurance it was stated that these were not to be considered in the proposal but that "responsibility for these items will be negotiated by the parties at a later date".

The proposal was asked to be made in four different and alternate ways, evidently to allow IBM to choose one from the four alternatives. The different alternatives were called "Item I" and so on. The investors, however, could bid on as many or as few of the alternatives as they wished.

The first alternative (Item I) was for an annual rental of the *entire* building and IBM would be responsible for maintenance.

The second alternative (Item II) was for an annual rental of the *entire* building and the investor would be responsible for the maintenance.

The third alternative (Item III) was (in substance) for an annual rental of *part* of the building and IBM would be responsible for maintenance.

The fourth alternative (Item IV) was (in substance) for an annual rental of *part* of the building and the investor would be responsible for the maintenance.

There was a further alternative. IBM was to have a right to purchase the property and asked for proposed purchase prices, including outstanding mortgages, at various times and under each of the four first alternatives given. But IBM asked the investor to specify whether at such purchase prices IBM would be required to assume outstanding mortgages or not.

Under date of June 6, 1963, Koufman sent his proposal to IBM on the form which IBM had supplied. Koufman gave his proposed rental and purchase dollar amounts under each of the alternatives shown on the form. Koufman did not indicate, however, whether or not his purchase prices to IBM required IBM to assume outstanding mortgages. Koufman supplemented his proposal with a fifth and different rental and purchase alternative. The significance of the differences of this fifth alternative from the others is difficult for me to appreciate and not necessary for this decision; apparently it introduced the concept of a "net, net, net up to" basis; in any event, the fact is that the fifth alternative added by Koufman was different from the others.

Apparently IBM had itself asked for bids from contractors for construction of the Cranford building. The bids were opened at a New York hotel on June 19, 1963. Koufman was in the IBM office on that day before the opening of bids and was invited by IBM to go to the opening of bids, apparently because Daly and Roper (also of IBM) thought that Koufman would be selected as the investor. According to Koufman's testimony by deposition, Daly and Roper told him on that day that IBM was "interested" in Koufman's proposal under the first alternative (Item I). For purposes of the present motion, this will be assumed to be the fact. (It seems likely that Koufman is mistaken. A memorandum made by Daly at the time indicates that Koufman was low among four "bidders" under alternatives three and four (Items III and IV) but was not low among eleven bidders under the first alternative (Item I).)

Under date of June 24, 1963, Roper of IBM, signing himself "Manager Real Estate Department" wrote Koufman that IBM had "reviewed" his "bid" and had found that he was "the successful bidder". He was asked to see the architect about plans and specifications and "to take whatever steps are necessary to secure the land for which IBM has arranged in your name".

Apparently IBM felt that the cost of construction as shown by the bids opened on June 19, 1963, was much higher than expected and asked Koufman to try to reduce the cost. At some time after June 24, 1963, differences developed between IBM and Koufman.

Under date of August 27, 1963, Daly wrote Koufman that IBM had no choice but "to cancel out previous commitment" to him because Koufman would not carry out "the terms of [his] proposal which IBM had accepted".

Koufman made no arrangements to buy the land in Cranford.

This action was commenced on March 29, 1966.

IBM asserts that the substantive law of New York is applicable. Counsel for plaintiff do not disagree and appear to assume that New York law is applicable. *Without discussion*, New York courts have applied New York law in a case where the land to be developed was outside New York and where the situation was otherwise like that at a bar. St. Regis Paper Co. v. Rayward, 16 A.D.2d 130, 225 N.Y.S.2d 871 (1st Dept. 1962) aff'd without opinion, 12 N.Y.2d 1033, 239 N.Y.S.2d 551, 189 N.E.2d 815 (1963). This result seems indicated by the principles laid down in Auten v. Auten, 308

N.Y. 155, 124 N.E.2d 99, 50 A.L.R.2d 246 (1954).

It must be emphasized that the claim in count I is on a "written contract" which was "entered into" on or about June 25, 1963 (complaint, para. 4). Koufman testified that it was probably on June 25, 1963 that he received the Roper letter dated June 24, 1963. Koufman testified that the "written contract" consisted of three documents: (1) the invitation of IBM (Daly) dated May 23, 1963; (2) the IBM proposal form signed by Koufman and dated June 6, 1963; and (3) the letter of IBM (Roper) dated June 24, 1963. Koufman's opposing affidavit (p. 3) described his June 6, 1963 signed form as his "offer" and the IBM June 24, 1963 letter as the "acceptance". Likewise the opposing affidavit (pp. 1, 2) of counsel to Koufman describes the signed form dated June 6, 1963 as Koufman's "offer" and then states: "IBM accepted plaintiff's offer by a writing dated June 24, 1963". The statement for plaintiff under General Rule 9(g) makes exactly the same analysis.

█ The evidence seems clear that despite the loose language of Daly and Roper ("Successful bidder", "commitment to you", "accepted", etc.) the parties did not intend the three documents to be any final agreement. They were not intending thereby to contract but to begin final negotiations with each other (excluding the other investor bidders) in the expectation that they would reach an agreement. At that last point they must have contemplated the execution of a letter agreement with specific provisions (such as that actually executed between them under date of June 13, 1963 in respect of a building to be constructed in Utica) to be followed by execution of a lease.

For purposes of this motion, however, it will be assumed that the parties intended to make a contract by means of the June 6 "offer" and the June 24 "acceptance".

It is apparent from the face of the "offer" and "acceptance" that no enforceable agreement was created between the parties.

In the first place, the "acceptance" was not sufficient to constitute any agreement because it did not specify which of the various alternatives IBM accepted. The proposal of Koufman was not one offer but a number of alternative and mutually exclusive offers. Only one of these could be accepted. IBM did not state in its "acceptance" to which of the offers it was directed. Did IBM accept to lease the entire building or only part? Did IBM accept to be responsible for maintenance or for Koufman to be responsible? Did IBM accept the "further proposal", the fifth alternative, suggested separately by Koufman in his June 6, letter? Did IBM accept to assume outstanding mortgages if it exercised the option to purchase the land and building?

The situation is like that referred to in the Restatement: "An offer * * * may contain a choice of terms from which the offeree is given the power to make a selection in his acceptance". Restatement of Contracts, § 29 (1932). Under this section (as slightly rewritten) in a later Tentative Draft Restatement appears this explanation (Restatement (Second) of Contracts § 29 (Tent. Draft No. 1, 1964)):

"An acceptance to be effective must comply with the terms of the offer, and those terms or the circumstances may make it plain that the acceptance must specify terms. * * * In such cases the offer does not fail for indefiniteness, but no contract is made by an attempted acceptance which does not supply the term as indicated."

The application of this principle is seen in Northeastern Const. Co. v. Town of North Hempstead, 121 App.Div. 187, 105 N.Y.S. 581 (2d Dept. 1907), very much like the case at bar. The Town called for bids on a bridge, prices to be given for a five span construction and a four span construction. Plaintiff submitted different prices for five span and four span. The Town Board resolved that the bid of plaintiff for the bridge

"be accepted". The Court held that there was no contract formed by such an acceptance, saying:

> "Two bids were asked for, two bids were made, and there was but one bridge to be constructed. The general resolution of acceptance of the plaintiff's proposition was not entering into a contract for the construction of a four or five span bridge. It was merely a notification that both of the bids were lower than other bids, but the contract was yet to follow; and this was clearly contemplated by the form which was given out for such a contract, in company with the plans and specifications."

See also a classic decision in New York, frequently cited, Chicago & G. E. R. R. Co. v. Dane, 43 N.Y. 240 (1870).

■ In the next place, it is evident that if an agreement was formed, it is too imcomplete, uncertain and indefinite to be enforced. The same questions must be asked in this connection as were asked in the second paragraph above. But there are further missing elements to raise other questions. Who was to be responsible for taxes and insurance? The invitation of IBM flatly stated that this would "be negotiated by the parties at a later date". The argument for Koufman is persuasive that it must have been part of the invitation that IBM would ultimately absorb taxes and insurance; otherwise, the proposed rental figures by the investors would be meaningless. But how the "responsibility" for taxes and insurance would be handled—a significant element in any event—was left to future negotiation. Further: when was the 17 year lease to commence? Nothing was said about this. When was the building required to be completed? Nothing was said about this. In contrast, the letter agreement between the parties, dated June 13, 1963, with respect to the Utica property, provided for a specific completion date and a specific lease commencement date.

■ Where the agreement of the parties is incomplete, uncertain and indefinite the courts are unable to enforce it either by specific performance or by an award of damages. Restatement of Contracts § 32; Restatement (Second) of Contracts § 32 (Tent. Draft No. 1); 1 Corbin on Contracts § 95 (1963); Ginsberg Machine Co. v. J. & H. Label, etc. Corp., 341 F.2d 825, 828 (2d Cir.1965); Brause v. Goldman, 10 A.D.2d 328, 199 N.Y.S.2d 606, 612–614 (1st Dept., 1960), aff'd without opinion 9 N.Y.2d 620, 210 N.Y.S.2d 225, 172 N.E.2d 78 (1961).

In Brause v. Goldman, summary judgment was ordered for defendant, reversing the Special Term.

St. Regis Paper Co. v. Rayward, cited above, is strikingly similar to the case at bar. There also summary judgment was ordered, dismissing a counterclaim on an alleged contract and reversing the Special Term.

In the case at bar, it would be impossible to decree specific performance because the Court is unable to determine what IBM agreed to perform. For the same reason it would be impossible to award damages; it may be noted in this connection that the computation of damages would depend on the specific promises which IBM had failed to perform and there are no specific promises.

It was earlier emphasized that this is a claim for breach of a "written contract" said to have consisted of three particular documents, the second of which was the offer and the third was the acceptance.

■■ It is suggested at one point for Koufman that the defect in these documents can be repaired by reference to deposition testimony of Koufman (accepted as true on this motion), namely, that he was told that IBM was "interested" in Item I, the first alternative. It is suggested (memorandum for plaintiff, p. 2) that IBM thereby "orally accepted" Koufman's proposal under Item I. In point of fact, this cannot be. An acceptance must be "positive and unambiguous". 1 Williston on Contracts (3d Ed.) 235. An offeree who says "I am interested in your offer" is obviously not ac-

cepting and not promising anything. The language means simply "my attention is engaged" or "my curiosity or sympathy is aroused", as the dictionary states (Webster's Third, p. 1178), or possibly "I am considering your offer". The language cannot possibly support the meaning of a *then* acceptance.

Koufman points to a memo by Daly in pencil, comparing the various bids at the time and with a checkmark at the name of Koufman. It is said that the checkmark is "next to Item I * * * indicating IBM's acceptance of proposal Item I" (Layton affidavit, p. 8). The location of the checkmark at the name of Koufman seems reasonably to evidence that *he* is the best bidder and to indicate nothing as to which of his alternatives would be best for IBM. In any event, the checkmark is not itself any acceptance and not claimed to be such.

In point of law, moreover, there could be no real acceptance by IBM because of the statute of frauds. In New York, a "contract for the leasing for a longer period than one year" of land must be in writing. General Obligations Law § 5–703(2). The contract claimed by plaintiff was one "for the leasing" by IBM of land for more than one year. The theory of oral acceptance is thus unavailing.

■ It remains to point out that the statute of frauds is a bar to plaintiff even if the documents alone were held to create a contract. The "acceptance" of June 24, 1963 is signed by Roper. It is beyond dispute that he had no actual authority to contract for IBM. I would agree with plaintiff that Roper had apparent authority to do so. Under the New York statute of frauds, however, this is not enough, for General Obligations Law § 5–703(2) requires that the writing must be "subscribed by the party to be charged, or by his lawful agent thereunto authorized by writing". A corporation may only act by agents. Neither Roper nor Daly was authorized in writing to contract for IBM which thus could not in any event be bound by any contract made by them to which the statute of frauds is applicable. Mon-

drus v. Salt Haven Corp., 270 App.Div. 1030, 63 N.Y.S.2d 205 (2d Dept. 1946), motion for leave to appeal denied 270 App.Div. 1046, 63 N.Y.S.2d 839; Goldberg v. Spruce Ridge Corp., 35 Misc.2d 253, 229 N.Y.S.2d 307 (Sup.Ct.1962); 2 Corbin on Contracts § 526 at 781–782 (1950).

The motion is granted. Final judgment at this time as to Count I is not appropriate, however, and no determination and direction under Fed.R.Civ.P. 54(b) will be made. There must be a trial and IBM remains as a party defendant in the third count. If there is to be any appeal, it should include everything; the action should not go up piecemeal. Moreover, IBM did not make the motion until after the action was on the Permanent Calendar and after a pre-trial order had been made. There should be a speedy trial which should not be delayed by any appeal from this order.

So ordered.