## MCI TELECOMMUNICATIONS CORPORATION, Plaintiff,

v.

## VALUE CALL INTERNATIONAL, INC., Defendant.

### No. CIV.A. 96–2509–KHV.

United States District Court, D. Kansas.

Nov. 17, 1997.

Heather Suzanne Woodson, Stinson, Mag & Fizzell, P.C., Overland Park, KS, John C. Aisenbrey, Russell A. Berland, Stinson, Mag & Fizzell, P.C., Kansas City, MO, for Plaintiff.

J. Nick Badgerow, Spencer, Fane, Britt & Browne, Overland Park, KS, Randall A. Smith, Andrew L. Kramer, L. Tiffany Haw-

kins, Smith, Jones & Fawer, New Orleans, LA, for Defendant.

### MEMORANDUM AND ORDER

VRATIL, District Judge.

MCI Telecommunications Corp. filed suit on November 19, 1996, seeking declaratory relief concerning contractual disputes involving its customer, Value Call International, Inc. [Value Call]. Value Call counterclaimed for violations of the Communications Act of 1934, 47 U.S.C. § 203, breach of contract, fraud, tortious interference with contract, and negligence. This matter comes before the Court on *Plaintiff's Motion For Partial Summary Judgment* (Doc. # 126) filed July 1, 1997. Except as otherwise noted below, the Court finds that MCI is entitled to judgment as a matter of law on both its claim for declaratory relief and Value Call's counterclaims for violations of the Communications Act of 1934, breach of contract, and fraud.

### Summary Judgment Standard

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Federal R. Civ. P. 56(c); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2509–10. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. at 2512.

The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga,* 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Securities, Inc.,* 912 F.2d 1238, 1241 (10th

Cir.1990); *see also Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887, 891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics,* 912 F.2d at 1241.

■ "[W]e must view the record in the light most favorable to the parties opposing the motion for summary judgment." *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Anderson,* 477 U.S. at 250–51, 106 S.Ct. at 2511–12. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 793 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson* at 251–52, 106 S.Ct. at 2511–12. Ever mindful of these summary judgment standards, the Court now turns to the merits of plaintiff's motion.

### Factual Background

The following facts are uncontroverted, or where controverted, viewed in the light most favorable to defendant.

MCI is a common carrier which sells telecommunications services. Value Call buys telecommunications services for resale to end users. In late 1995, Value Call approached MCI about purchasing long distance services for resale. Chuck Long, branch manager of MCI's branch office in Overland Park, Kansas, proposed rates that were attractive to Value Call and in an attempt to obtain a tariff option which would reflect those rates, he directed Tom Archer, an MCI sales manager, to seek approval from MCI's Business Planning, Analysis & Development Group ("Business Development Group"). Long also

directed Archer to commit MCI through a Special Customer Arrangement ("SCA")[1] and told him to arrange for Value Call to enroll a portion of its proposed usage under a tariff option which MCI had previously created for the Carlson Hospitality Group ("Carlson").[2]

MCI's Business Development Group did not approve the rates that Long had proposed to Value Call, but in March 1996, Archer nonetheless sent Value Call a proposed SCA, a proposed Carlson Enrollment Form and Agreement, and a proposed guarantee of Value Call's debt by its corporate parent, Saratoga Telephone Company, Inc. [Saratoga]. When Value Call complained that the proposed agreements and enrollment form did not contain the rates which Long had previously quoted, Long told Value Call to draft amendments which reflected the agreed rates. Value Call did so and on March 28, 1996, its president, Evans House, signed an agreement that modified the SCA which MCI had proposed, including its rates. House also signed an agreement which modi-

fied the Carlson Enrollment Form which MCI had proposed (including a credit of $90,-000 per month) and a 90–day limited guarantee of Value Call's debt by Saratoga.[3] For ease of reference these documents are hereafter referred to as "Value Call documents." House also signed the SCA and Carlson Enrollment documents which MCI had originally proposed [hereafter referred to as "MCI documents"] and sent both the Value Call documents and the MCI documents to MCI's branch office.

As of March 28, 1996, when Value Call signed these documents and sent them to MCI, MCI had not signed anything. When MCI received the documents, Archer faxed Saratoga's limited guarantee to the MCI credit analysis department. He sent the MCI documents to MCI's Law and Public Policy department, to initiate the MCI approval process. Acting on instructions from Long, however, Archer signed Long's name to the Value Call documents and faxed them back to Value Call.[4] Consequently, MCI and Value Call executed the *revisions* to the doc-

1. An SCA is basically a contract between a customer and a common carrier which specifies rates, discounts, and other provisions that apply to the carrier's tariffed services. Once filed as a tariff option with the Federal Communications Commission ("FCC"), an SCA amends the carrier's existing tariff to provide particular rates for a particular customer. Those rates are available as tariff options for similarly situated customers, by means of an enrollment form, if they satisfy the criteria for the particular tariff option. In this case, the proposed SCA provided the following with respect to tariffs:

MCI will provide Customer interstate and international telecommunications service(s) provided pursuant to the Tariff No. 1, MCI Tariff FCC No. 8, WUI Tariff FCC No. 27, and any other interstate and international tariff of MCI and its affiliates, each as supplemented by this Agreement, and intrastate telecommunications services provided pursuant to MCI's state tariffs governing such services ("MCI Tariffs"). This Agreement incorporates by reference the terms of each such tariff .... In the event of inconsistency between this Agreement and applicable MCI Tariffs or the TO [Tariff Option], the TO or applicable MCI Tariffs shall govern.

2. The Carlson agreement provides that companies which are "related entities" may enroll under its tariff option with MCI. In the Carlson Enrollment Form, Value Call agreed to purchase V–Net (an MCI 800–number service) for two years, in accordance with the Carlson Tariff Option. The Enrollment Form also stated:

MCI agrees to provide MCI tariffed services to Value Call [VALUE CALL] as an extension of the appropriate services, terms and conditions provided to Carlson and its related entities under the Carlson Agreement, as supplemented by this Enrollment Form and Agreement. Such services are provided pursuant to MCI Tariffs F.C.C. Nos. 1 and 8, WUI Tariff F.C.C. No. 27, and any other applicable interstate, intrastate and international tariffs of MCI and its affiliates, each as supplemented by the Carlson Agreement and as supplemented by this Enrollment Form and Agreement. This Enrollment Form and Agreement incorporates by reference the terms of each such tariff.

3. MCI Tariff No. 1 provides that MCI may require security for payment, including advance payments or third party guarantees. The parties disagree whether MCI required that Saratoga execute the guarantee as a condition of MCI accepting the SCA. Value Call denies that MCI required any such guarantee or security, but it does not deny that House (acting in his capacity as Saratoga's vice president) executed a 90–day limited guarantee for Value Call's debt.

4. According to the documents which MCI proposed, Value Call's usage would equal or exceed $500,000 per month under the SCA, and $100,-000 per month under the Carlson Tariff. Under the documents which Value Call proposed, the parties agreed to a six-month "ramp-up" period for Value Call.

uments which MCI had proposed, but only Value Call signed the underlying documents.

MCI never did sign the documents which it had originally proposed to Value Call. Moreover, it did not file with the Federal Communications Commission ("FCC") any tariff option which reflected the rates, credits, terms, and conditions to which Long and Value Call had agreed in the Value Call documents.

The parties disagree whether Archer accepted Value Call's documents when he signed them on behalf of MCI. MCI claims that he did not. Value Call argues not only that he accepted the revisions on behalf of MCI, but that he also, through operation of an incorporation clause, accepted the agreements which MCI had originally proposed. Value Call also argues that by their very terms, the Value Call documents became effective when Value Call signed them—even if MCI refused to do so. MCI claims that even if Archer accepted the Value Call documents, he lacked authority to execute them on behalf of MCI and MCI never utilized the rates and credits set forth therein. Value Call again disagrees, asserting that Archer had actual or apparent authority to bind MCI and that MCI in fact billed Value Call some of the agreed rates.

The parties agree that the MCI documents did not include the rates and credits which Long had promised. Value Call expected Long to make up the difference between the promised rates and credits, and those contained in MCI's documents, through MCI's "checkbook" program.[5]

### Analysis

#### *Summary of the Arguments*

MCI asserts that this case is controlled by the filed rate doctrine,[6] which holds that a common carrier tariff—once filed with the FCC—has the force and effect of federal law

and exclusively governs the rights and liabilities of the customer and the carrier. MCI argues that under this doctrine, because it did not file any Value Call tariff option with the FCC, the purported agreements could not effectively modify the rates and credits available under MCI's Tariff No. 1. Further, MCI contends that even if the filed rate doctrine does not invalidate the agreements, none of the agreements were executed in conformity with the statute of frauds. MCI therefore seeks summary judgment on its claim that notwithstanding any purported agreement by Long and Archer, MCI tariffs control the rates, credits and terms of service to Value Call. Specifically, MCI contends that it is entitled to judgment declaring that Value Call is liable for nonpayment under the terms of Tariff No. 1. MCI maintains that the filed rate doctrine and statute of frauds also govern Value Call's state law counterclaims for breach of contract and fraud, as well as Value Call's counterclaim that MCI breached the Communications Act by failing to bill Value Call at promised rates.[7] MCI therefore asserts that it is entitled to summary judgment on these claims as well.

■ Value Call responds that the record reveals genuine issues of material fact, but even if the Court finds no genuine issues of material fact, MCI's motion should be denied as a matter of law. Value Call argues that the FCC has recently ordered detariffing of all nondominant carriers and that as a result, the filed rate doctrine is inapplicable to the carriers, resellers and services at issue in this case.[8] In addition, Value Call argues that the filed rate doctrine does not apply because (1) MCI did not treat it as being in effect at the applicable time; (2) MCI breached its contractual duty to file the Value Call documents as tariff options with the FCC; and (3) MCI has admitted that the

---

5. "Checkbook" is a promotion under MCI's Tariff No. 1. Under the tariff, checkbook credits are limited to $50,000 per customer over the life of the contract.

6. Also known as the "filed tariff doctrine" or "tariff doctrine."

7. MCI does not seek summary judgment on Value Call's counterclaims for intentional interference with contract and negligence.

8. MCI is challenging the FCC's detariffing order in an action now pending in the District of Columbia Court of Appeals, *MCI Telecomms. Corp. v. FCC*, No. 96–1459, and if this Court finds that the filed tariff doctrine applies, Value Call asks that it defer ruling on this motion until the District of Columbia Court of Appeals completes its review of the FCC detariffing order. We decline to do so, because the interests of justice are not served by further delay in this matter and we do not believe that defendant's position has sufficient merit to warrant such delay.

SCA was valid and enforceable, and doctrines of waiver, laches, estoppel and/or ratification prohibit it from invoking the filed tariff doctrine as a shield from liability. In addition, Value Call contends that the statute of frauds does not bar either its defenses to MCI's claims or its affirmative claims for relief, because MCI agents had actual or apparent authority to bind their principal, and because the SCA became effective when Value Call executed it—even if MCI never signed. Furthermore, Value Call argues that it was entitled to credits either under the Carlson Contract Tariff or MCI's checkbook program— both of which were filed tariffs—and that the filed rate doctrine has no application to those credits. Finally, Value Call insists that if MCI had another filed tariff with similar rate provisions for which Value Call qualified, the filed rate doctrine would not prevent Value Call from obtaining the rates which Long had promised.[9]

### Statute of Frauds

■ MCI asserts that even if the contractual documents in this case survive the filed rate doctrine, they are ineffective and unenforceable under the Kansas statute of frauds. K.S.A. § 33–106.[10] The statute of frauds requires that any agreement that is incapable of being performed within one year "shall be in writing and signed by the party to be charged ... or some other person thereunto by him lawfully authorized in writ-

ing." *Id.*; *Reno v. Beckett,* 555 F.2d 757, 766 (10th Cir.1977) ("Under Kansas law, when the original contract must be in writing, any substantial modification thereof is also governed by the Statute of Frauds ... [A]ny modification is unenforceable in the absence of evidence that the person signing the modification had written authorization from [his principal].").[11]

■ The agreements at issue in this case must be in writing and signed because they are not capable of being performed within one year. The SCA by its terms is a three-year contract and the Carlson Enrollment Form by its terms is a two-year contract. Because the revisions purport to amend those contracts, they are also subject to the same two- and three-year periods. Although Archer was acting on instructions from Long when he signed Long's name to the Value Call documents, Value Call does not seek to charge Long or Archer with liability in this case. Moreover, aside from certain internal MCI e-mails—which purported to approve Value Call bills at the rates proposed by Value Call[12]—Value Call identifies no writings which purport to authorize Long and Archer to execute the agreements on behalf of MCI. Consequently, even if MCI employees manifested a position that Long and Archer had the necessary authority, Value Call's argument must fail in the absence of written authorization.[13]

---

9. This defense does not appear in the *Pretrial Order* (Doc. # 155) filed August 20, 1997, and Value Call has not identified a similar rate for which it qualifies. We therefore decline to further address this issue.

10. Although the SCA provides that New York law shall govern the agreement, Value Call stipulates that there is no material distinction between Kansas and New York law regarding the statute of frauds.

11. The Kansas statute of frauds provides in pertinent part:

No action shall be brought whereby to charge a party upon ... any agreement that is not to be performed within the space of one year from the making thereof, unless the agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith, or some other person thereunto by him or her lawfully authorized in writing.

K.S.A. § 33–106. *See also Koufman v. IBM,* 295 F.Supp. 784, 789 (S.D.N.Y.1969); *Diocese of Buf-*

*falo v. McCarthy,* 91 A.D.2d 213, 458 N.Y.S.2d 764, 767 (1983).

12. These internal e-mails include an e-mail dated August 4, 1996, authored by MCI's business development analyst, Ellen Kobold; an e-mail dated September 17, 1996, authored by MCI's in-house counsel, Dawn McCashin; and an e-mail dated September 19, 1996, authored by MCI's billing implementation analyst, Regina Hudson. The record contains no evidence that the authors of these e-mails had written authority to approve or ratify the agreements in question.

13. Finally, Value Call argues that the original SCA (which MCI drafted) became effective when Value Call executed it—even without MCI's signature—because of a self-execution clause which states: "This agreement is effective when executed by the Customer." Nevertheless, Value Call fails to note the additional language beneath the signatory section in the agreement, which states: "Valid if signed by Customer by March 29, 1996 *and subsequently accepted by MCI* " (emphasis

■ The fact that Long and Archer signed the agreements does not prove that they had the authority to do so. Such evidence is insufficient in light of the rule that an agent may not, by his own acts, confer upon himself actual or apparent authority to bind his principal. *See, e.g., Cox v. Pabst Brewing Co.,* 128 F.2d 468, 472 (10th Cir.1942) ("Authority of an agent is based upon the words or acts of the principal, and not the agent."); *Pegg v. General Motors Corp.,* 785 F.Supp. 901, 910 (D.Kan.1992) ("Apparent authority stems from the actions or words of the principal.").

■ Nor may the doctrine of equitable estoppel save Value Call from the statute of frauds. Estoppel requires Value Call to show that it acted in reasonable reliance upon MCI's promise. *Decatur Co-op. Ass'n v. Urban,* 219 Kan. 171, 547 P.2d 323 (1976). Value Call has not demonstrated a genuine issue of material fact concerning reasonable and good faith reliance upon promises by Long or Archer. Also, because the filed rate doctrine charges the customer with knowledge of the applicable tariff, Value Call has raised no material issue of fact which is sufficient to defeat MCI's motion for summary judgment on this issue. *Pay Phone Concepts v. MCI Telecommunications Corp.,* 904 F.Supp. 1202, 1207 (D.Kan.1995).

### The Federal Communications Act and The Filed Rate Doctrine

■ Even if the Court were to find that the agreements and revisions satisfy the statute of frauds, those agreements are unenforceable under the filed rate doctrine (which derives from Section 203 of the Federal Communications Act ("FCA")). *Cincinnati Bell Tel. Co. v. Allnet Communication Servs., Inc.,* 17 F.3d 921, 924 n. 4 (6th Cir. 1994).[14, 15]

The express purpose of the FCA is to regulate interstate and foreign commerce in telecommunications in order to make available a rapid and efficient communication service with adequate facilities at reasonable rates. 47 U.S.C. § 151. To achieve that purpose, the FCA provides that all "charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful." 47 U.S.C. § 201(b). Section 203 of the FCA requires that all telecommunications common carriers file with the FCC schedules which show the terms and conditions under which they will provide services to customers. 47 U.S.C. § 203(a). These filed schedules are known as tariffs. *Richman Bros. Records v. U.S. Sprint,* 953 F.2d 1431, 1435 (3d Cir.1991), *cert. denied,* 505 U.S. 1230, 112 S.Ct. 3056, 120 L.Ed.2d 921 (1992). Tariffs must be available for public inspection and they must specify the carrier's charges, classifications, practices, and regulations. 47 U.S.C. § 203(a). Furthermore, carriers can charge only those rates listed in the tariff. 47 U.S.C. § 203(c)(1).[16] The charges, classifica-

---

added). Neither party has addressed the legal effect of this language. Even if the Court were to conclude that Value Call's unilateral execution were sufficient to satisfy the statute of frauds, the Court nonetheless finds the agreement unenforceable under the filed rate doctrine. See discussion at 1384.

**14.** The filed rate doctrine developed in decisions under the Interstate Commerce Act ("ICA"), which regulated railroads and other common carriers before the advent of regulated telecommunications. Filed rate doctrine cases which involve the ICA are controlling precedent for cases under the FCA. *See, e.g., MCI Telecomms. Corp. v. American Tel. & Tel. Co.,* 512 U.S. 218, 227–32, 114 S.Ct. 2223, 2229–32, 129 L.Ed.2d 182 (1994) (relying on ICC cases including *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990), for interpretation of filed rate doctrine under FCA); *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 577–78 n. 7, 101 S.Ct. 2925, 2930 n. 7,

69 L.Ed.2d 856 (1981); *Phillips Pipe Line Co., Inc. v. Diamond Shamrock Refining and Marketing Co.,* 50 F.3d 864, 867 (10th Cir.1995); *MCI Telecomms. Corp. v. Graham,* 7 F.3d 477, 479–80 (6th Cir.1993).

**15.** According to the Tenth Circuit, the two justifications for the filed rate doctrine are (1) preservation of the regulatory agency's primary jurisdiction over reasonableness of rates; and (2) the need to insure that regulated companies charge only those rates of which the agency has been made cognizant. *Phillips Pipe Line Co.,* 50 F.3d at 867; *see also H.J. Inc. v. Northwestern Bell Tel. Co.,* 954 F.2d 485, 488 (8th Cir.1992), *cert. denied,* 504 U.S. 957, 112 S.Ct. 2306, 119 L.Ed.2d 228 (1992); *Wegoland Ltd. v. NYNEX Corp.,* 27 F.3d 17, 19 (2d Cir.1994).

**16.** Section 203(c) of the FCA expressly forbids a carrier from (1) charging or collecting any rate other than the rate expressed in that carrier's

tions, regulations or practices in the filed tariff may be changed only after notice to the FCC and the public, in a form required by regulation. 47 U.S.C. § 203(b)(1). Finally, the FCC is responsible for regulating the substance of tariff provisions. 47 U.S.C. § 203(b).

■ Under the filed rate doctrine, a filed tariff supercedes any other agreements between the carrier and its customers. 47 U.S.C. § 203(c). Indeed, valid tariffs filed with the FCC "conclusively and exclusively control the rights and liabilities between a carrier and its customer." *Graham,* 7 F.3d at 479; *see also Cincinnati Bell Tel. Co.,* 17 F.3d at 923 n. 4; *MCI Telecomms. Corp. v. Graphnet, Inc.,* 881 F.Supp. 126, 132 (D.N.J. 1995); *MCI Telecomms. Corp. v. Garden State Inv. Corp.,* 981 F.2d 385, 387 (8th Cir. 1992) ("federal tariffs are the law, not mere contracts."). The classic statement of the doctrine, as quoted in *Maislin,* 497 U.S. at 127, 110 S.Ct. at 2766, appears in *Louisville & Nashville R. Co. v. Maxwell,* 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915). There, the Supreme Court held that a passenger who had purchased a train ticket at a rate which had been misquoted by a railroad ticket agent did not have a defense against subsequent collection of the higher tariff rate. The Supreme Court explained its holding as follows:

> Under the [ICA] the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it, unless it is found by the [ICC] to be unreasonable. Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination.

■ Because the law presumes that a customer knows the applicable tariff, the filed rate doctrine prevents a customer from enforcing contract rights that contravene governing tariff provisions, *Graphnet, Inc.,* 881 F.Supp. at 132–33; *Marcus v. AT&T Corp.,* 938 F.Supp. 1158, 1169 (S.D.N.Y.1996) (quoting *Keogh v. Chicago & N.W. Ry.,* 260 U.S. 156, 163, 43 S.Ct. 47, 49–50, 67 L.Ed. 183 (1922) (rights defined by tariff cannot be varied or enlarged by contract or tort of carrier), or from asserting estoppel against the carrier, *Marco Supply Co., Inc. v. AT&T Comm.,* 875 F.2d 434, 436 (4th Cir.1989)). Nor may a carrier charge rates other than those contained in a properly filed tariff. *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 577, 101 S.Ct. 2925, 2930, 69 L.Ed.2d 856 (1981).

In *Maislin,* the Supreme Court held that the ICC could not preclude collection of a filed rate on the grounds that the carrier had engaged in an unreasonable practice by agreeing to a lower rate, and then seeking to recover the higher filed rate. Addressing the rationale for the filed rate doctrine, the Supreme Court noted:

> This rigid approach was deemed necessary to prevent carriers from intentionally "misquoting" rates to shippers as a means of offering them rebates or discounts. See S.Rep. No. 46, 49th Cong., 1st Sess., 181, 188–190, 198–200 (1886). As the [ICC] itself found: "[P]ast experience shows that billing clerks and other agents of carriers might easily become experts in the making of errors and mistakes in the quotation of rates to favored shippers, while other shippers, less fortunate in their relations with carriers and whose traffic is less important, would be compelled to pay the higher published rates." Despite the harsh effects of the filed rate doctrine, we have consistently adhered to it.

*Maislin,* 497 U.S. at 127–28, 110 S.Ct. at 2766–67 (citations omitted).

The present case is similar to that of *Multi Communication Media, Inc. v. AT&T Corp.,* 1997 WL 188938 (S.D.N.Y.1997) (unpublished). There, a customer claimed that AT&T had charged rates which were higher than those promised by its agent. The cus-

---

tariff; (2) refunding any portion of the tariff charges; or (3) extending any privilege, or employing any classification, regulation or practice

other than those listed in the tariff filed with the FCC. 47 U.S.C. § 203(c).

tomer paid only the quoted rates and when AT&T threatened to terminate service, it sued AT&T for breach of contract, fraud, rate discrimination, negligent misrepresentation, unfair competition and willful misconduct. AT&T counterclaimed, demanding payment at the tariff rate. The district court granted AT&T's motion for summary judgment on each count of the customer's complaint, even though the customer had signed a contract in reliance on the representation that the quoted rates would apply and that the agent would try to obtain even lower rates. Relying on the filed rate doctrine, the district court held that:

> AT&T could not charge, and plaintiff could not pay, the alleged lower negotiated rate, even if the [letter] was attached to the contract and even if plaintiff believed this rate was the applicable rate.

*Id.* at *5 (citing *Delta Traffic Serv., Inc. v. Appco Paper & Plastics Corp.*, 931 F.2d 5, 7 (2d Cir.1991) (existence of negotiated rate does not justify deviation from filed tariff or disentitle carrier to collection of undercharges.)); *see also Marco*, 875 F.2d at 436; *F. Burkhart Mfg. Co. v. Fort Worth & D.C. Ry. Co.*, 149 F.2d 909 (8th Cir.1945).

Courts have been relentlessly unwilling to use fraud as a ground for enforcing agreements which are not reflected in filed tariffs. *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 22 (2d Cir.1994) (no fraud exception to filed rate doctrine); *Marcus*, 938 F.Supp. at 1169 (dismissing customers' claim that carrier fraudulently concealed practice of rounding up charges to next full minute; customers who paid filed rate had no legally cognizable

claim for damages or fraud); *Consolidated Freightways Corp. v. Terry Tuck, Inc.*, 612 F.2d 465, 466 (9th Cir.1980) (no claim for relief predicated on carrier's fraudulent misquotation of rates); *International Telecomm. Exchange Corp. v. MCI Telecomms. Corp.*, 892 F.Supp. 1520, 1541 (N.D.Ga.1995) (tariff, and not representation of carrier's employees, controls).[17]

### Application of the Filed Rate Doctrine to MCI's Claim for Relief

 MCI asserts that because it never filed the purported agreements with the FCC, the filed rate doctrine required MCI to bill Value Call at the rates and credits contained in MCI's Tariff No. 1. In opposition, Value Call's main argument—and supposedly also its strongest argument—is that the filed rate doctrine does not apply because the FCC abolished the doctrine by its detariffing order.[18] Value Call's position is not persuasive. As MCI correctly points out, all of the events which gave rise to this case occurred before the effective date of the detariffing regulations (December 23, 1996). At the time MCI filed suit on November 19, 1996, the detariffing regulations had not taken effect. In fact, all of the relevant events in this case occurred before the FCC had even promulgated the detariffing regulations.

 In addition, on February 13, 1997, the District of Columbia Circuit Court of Appeals stayed the FCC detariffing order pending appeal. Because a stayed regulation has no operation or effect during the pendency of an appeal,[19] the filed tariff doctrine continues in effect even today. Further-

---

17. It appears that only one court has diverged from this established authority. In *MCI Telecomms. Corp. v. TCI Mail, Inc.*, 772 F.Supp. 64 (D.R.I.1991), the district court declined to dismiss TCI's claims for breach of contract and fraudulent misrepresentation. In that case, however, the filed tariff permitted recovery if the carrier engaged in willful misconduct during contract negotiations. Because the tariff did not preclude a contract or tort claim based on "willful misconduct," the court concluded that such claims could not be dismissed, even if its holding contradicted the Fourth Circuit decision in *Marco. Id.* at 68. Here, however, Value Call does not point to a willful misconduct clause. Indeed, Value Call seeks to avoid application of the tariff doctrine altogether. We therefore decline to adopt that court's reasoning.

18. Value Call also claims that because MCI did not raise the filed rate defense until well into the litigation, equitable considerations prevent MCI from maintaining that defense. The Court can well understand Value Call's frustration at the need to confront the filed rate doctrine at a relatively late stage in the litigation. By the same token, Value Call did not object when MCI advanced the filed rate defense in the proposed pretrial order. Accordingly, MCI is not barred from asserting the defense in its motion for summary judgment.

19. *See Ecee, Inc. v. Federal Power Comm'n*, 526 F.2d 1270, 1274 (5th Cir.), *cert. denied*, 429 U.S. 867, 97 S.Ct. 176, 50 L.Ed.2d 147 (1976); *Jupiter Corp. v. Federal Power Comm'n*, 424 F.2d 783, 791 (D.C.Cir.1969), *cert. denied*, 397 U.S. 937, 90 S.Ct. 944, 25 L.Ed.2d 118 (1970).

more, in its final detariffing order, the FCC prohibited the filing of new tariffs after December 23, 1996, and ordered carriers to cancel existing tariffs after September 23, 1997. Value Call cites no authority for the proposition that the FCC ordered immediate cancellation of existing tariffs (rather than cancellation after September 23, 1997). Nor does Value Call point to any kind of retroactivity clause that would permit the Court simply to ignore the filed rate doctrine. It clearly applies in this case.[20]

■ As a further defense to the filed rate doctrine, Value Call asserts that MCI breached its written promise to file the agreed rates, credits, and other agreements as tariff options with the FCC.[21] Even assuming that MCI did breach a contractual duty in this regard and that the parties executed the written agreements with full authority, in compliance with the statute of frauds, Value Call has no actionable claim for relief.[22] As the district court recently noted in *Fax Telecommunicaciones v. AT&T*, "the FCC has yet to address how the customers are to enforce these contracts and whether any liability can arise from [the telecommunications carrier's] failure to file such contract tariffs as promised .... The question of the Court's role in enforcing these contracts is left open." 952 F.Supp. 946, 953 (E.D.N.Y. 1996).

In *Fax Telecommunicaciones*, the customer alleged that an AT&T agent had promised to amend the existing tariff, in order to permit volume discounts and to award retroactive rates for new service. In reliance on this representation, the customer signed a three-year commitment under the existing tariff and switched its service to AT&T.

Thereafter, the AT&T agent gave the customer an Authority to Quote ("ATQ") that described what service the customer would receive after the discounts and rates were filed as a tariff. *Id.* at 949. AT&T repeatedly failed to bill at the promised rates, but AT&T's agent assured the customer that later bills would contain appropriate credits. AT&T finally offered the customer less attractive rates and advised that it would not amend the tariff to provide the promised rates. The customer refused the higher rates and stopped paying, so AT&T terminated service.

■ The customer filed suit, alleging that it had been over billed. It sought relief similar to that which MCI seeks in this case: declaratory judgment that the promised rate agreement was binding or, in the alternative, damages for failure to perform the agreement. AT&T counterclaimed for the amount due under the existing tariff. *Id.* at 950. The district court granted summary judgment for AT&T under the filed rate doctrine, holding that it could neither enforce the ATQ nor provide damages based on the proposed tariff which had not been filed with the FCC.[23] Noting that rate filing was central to administration of the FCA, the district court observed: "The core message from [*Maislin*] is that neither the courts nor the FCC can enforce unfiled rates, regardless of the equitable claims that may be raised." *Id.* at 954. To do otherwise, the district court concluded, would contradict the twin aims of the filed rate doctrine and the FCA itself.[24] We agree with this reasoning and conclude that the filed rate doctrine preempts any defense based on MCI's failure to file the contract as a tariff option.[25]

---

20. Value Call also argues that MCI admitted the validity and enforceability of the SCA, in that MCI billed Value Call at the agreed rates and MCI in-house counsel stated in internal e-mail that failure to file the SCA as a tariff option did not preclude enforcement of the agreement. In light of the Court's finding regarding the applicability of the filed rate doctrine, however, this argument is moot.

21. The SCA provides in pertinent part: "MCI will, if required, file a tariff option ("TO") consistent with the terms of [the attached rate schedule]."

22. The Court's analysis concerning this defense leads to the same outcome with regard to Value Call's counterclaims for breach of contract.

23. In addition, the court granted summary judgment for AT&T on its counterclaim for payment under the existing tariff. *Id.* at 957.

24. Those aims are to eliminate discrimination and prevent courts from engaging in the rate-making process by determining the availability and reasonableness of contract terms.

25. The Supreme Court's observation in *Maislin* is instructive on this point: "One would think that a shipper who has the market power to require a carrier to reduce his tariffs could also require proof from a carrier that the negotiated rates had been filed before tendering shipment ...." 497 U.S. at 131–32 n. 12, 110 S.Ct. at

■ Alternatively, Value Call argues that because the Carlson tariff is filed with the FCC, the filed rate doctrine cannot affect the validity and enforcement of the Carlson agreement between the parties in this case. Value Call reasons that because the Carlson Revision (which Value Call drafted and signed and which Archer also signed) incorporated the terms and conditions of the Carlson Agreement, and because the revision did not modify any rates set forth in the filed Carlson Tariff (Option No. 262 to MCI Tariff No. 1), the filed tariff doctrine does not bar Value Call from receiving the rates and credits in that tariff and the (untariffed) credits in the Carlson Revision.[26]

In response, MCI argues that it never signed the Carlson Agreement which it originally proposed to Value Call, and that the agreement is therefore unenforceable. Moreover, MCI argues that even if it accepted the Carlson *Revision* which Value Call proposed and which Archer signed, MCI never filed that revision as a tariff option and it is therefore unenforceable under the filed rate doctrine. According to MCI, Value Call is not entitled to either the rates and credits in the Carlson Tariff or the untariffed credits in the Carlson Revision.[27, 28]

■ The Court finds only one case which supports MCI's position that an enrollment form and agreement—which in this case have been incorporated in the revised agreement signed by both parties—must be filed with the FCC in order to take effect. The federal district court in *MCI Telecomms. Corp. v. Happy the Glass Man, Inc.*, recently considered whether a customer could avoid an arbitration clause in a filed tariff, where the customer had signed enrollment forms and agreements that incorporated the terms and conditions of that tariff. 974 F.Supp. 1016, 1020–21 (E.D.Ky.1997). The court did not directly discuss the question, but it implicitly concluded that execution of an enrollment form and agreement, even without filing, is sufficient to bind the customer and the carrier to the terms of a filed tariff which is referenced therein. *Id.* at 1021 (citing *Pay Phone Concepts v. MCI Telecomms., Corp.*, 904 F.Supp. 1202, 1207 (D.Kan.1995) (by enrolling to receive service pursuant to tariff, customer bound to terms of tariff)). We do not need to decide this issue, however, even if the enrollment form and agreement satisfy the statute of frauds. Under the doctrine of primary jurisdiction, the appropriate forum for this question is the regulatory agency responsible for interpretation and implementation of the regulatory scheme—the FCC.[29]

2768–69 n. 12. In this case one would think that Value Call, as the customer, had the power to require proof that MCI had filed the tariff options before it started doing business with MCI.

**26.** Specifically, Value Call argues that it was entitled to receive a $90,000 per month credit under the terms of the Carlson Revision and the Carlson Tariff. Alternatively, Value Call argues that even under Tariff No. 1 it was entitled to a $90,000 per month credit because at the time MCI offered the credits to Value Call, MCI's checkbook program (Tariff No. 1) did not set any limits on the amount of such credits an MCI branch office could issue.

**27.** Whatever significance the rates in the Carlson Revision may have, the key issue is what amount of credit was available to Value Call under the revision. Thus, the Court need not address separately what rates were available under the revision.

**28.** As to the amount of credit available to Value Call, MCI argues that Value Call cannot receive

credits in excess of $50,000, either under the Carlson Revision and Tariff, or under Tariff No. 1, because the credits that MCI offered to Value Call relied on the checkbook program, and Tariff No. 1 expressly limits checkbook credits to $50,-000 per customer per contract. For reasons stated below, the Court need not resolve the parties' dispute over what credits were available to Value Call either under the Carlson Revision and Tariff or under Tariff No. 1. See discussion at 1389, *infra*.

**29.** "Primary jurisdiction is invoked in situations where the courts have jurisdiction over the claim from the very outset, but it is likely that the case will require resolution of issues, which, under a regulatory scheme, have been placed in the hands of an administrative body." *Marshall v. El Paso Natural Gas Co.*, 874 F.2d 1373, 1376 (10th Cir.1989); *see also Mical Communications, Inc. v. Sprint Telemedia, Inc.*, 1 F.3d 1031, 1038–1040 (10th Cir.1993) (remanding to district court with instructions that it "stay the matter pending the issuance of a dispositive ruling by the FCC, whether by application by the parties in [the] case or otherwise.")

Courts have developed the primary jurisdiction doctrine "in order to avoid conflict between the courts and an administrative agency arising from either the court's lack of expertise with the subject matter of the agency's regulation or from contradictory rulings by the agency and the court." *MCI Communications Corp. v. American Tel. & Tel. Co.,* 496 F.2d 214, 220 (3d Cir.1974).

Both parties ask the Court to construe FCC filing requirements concerning their Carlson agreement and enrollment form, to ascertain what rates and credits are available to Value Call under the Carlson Agreement and Tariff, and to determine what credits are available to Value Call under MCI's checkbook program and Tariff No. 1. Resolution of these issues would require the Court to answer technical questions regarding filing requirements, rates, and credits under filed tariffs. Such questions are not within this Court's expertise, and this Court is not the appropriate forum for such questions. Such questions should be addressed to the FCC. But for the Court's ruling under the statute of frauds, any further litigation concerning such issues would be stayed pending the issuance of a dispositive ruling by the FCC, whether by application of the parties or otherwise. *See Mical Communications, Inc. v. Sprint Telemedia, Inc.,* 1 F.3d 1031, 1038–40 (10th Cir.1993).[30]

Accordingly, the Court finds that plaintiff's motion for summary judgment on its claim for declaratory relief should be sustained. The Court finds as a matter of law that the purported agreements between MCI and Value Call are ineffective to the extent that they modify rates and credits available under Tariff No. 1, and that MCI is entitled to judgment declaring that Value Call is liable for nonpayment under MCI's filed tariff rates.

### Value Call Counterclaims

The Court need not address in depth the Value Call counterclaims for violation of the Federal Communications Act, fraud and misrepresentation—all of which arise from the same facts and issues involved in MCI's claims for declaratory relief and Value Call's counterclaim for breach of contract (see n. 22, *supra*). Based on the foregoing analyses regarding the statute of frauds and the preemptive effect of the filed rate doctrine—under which the Court must find for plaintiff as a matter of law—these remaining counterclaims also must fail. Therefore, the Court hereby grants plaintiff's motion for summary judgment on Value Call's counterclaims for breach of contract, for violations of the Federal Communications Act, and for fraud and misrepresentation.

30. In both *MCI Comm. Corp. v. American Tel. & Tel Co.* and *Mical,* proceedings were already pending before the FCC. The courts in those cases noted that a pending proceeding is merely one among a number of factors relevant to application of the doctrine. *See, e.g., Gulf States Utils. Co. v. Alabama Power Co.,* 824 F.2d 1465, 1473 (5th Cir.1987). Accordingly, the fact that no proceedings are pending before the FCC in this case does not affect the Court's decision. The FCC may assume jurisdiction on its own or by motion of any interested party. 47 C.F.R. § 1.1 (1996) ("The FCC may on its own motion or petition of any interested party hold such proceedings as it may deem necessary ... in connection with the investigation of any matter which it has power to investigate under the law ....."). "Under the doctrine of primary jurisdiction, the judicial process is suspended pending referral of the issues to the administrative body for its views." *Marshall v. El Paso Natural Gas Co.,* 874 F.2d at 1377 (citing *United States v. Western Pacific R.R. Co.,* 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956)). If the statute of frauds did not bar Value Call's claims

relating on the various agreements, the Court would defer to the FCC on the following complex issues, the resolution of which requires special agency competence: (1) the interpretation and effect of non-compliance with FCC enrollment form filing requirements; (2) the parties' disputes regarding what tariff rates and credits are available to Value Call and the amount of those rates and credits; and (3) any dispute about what rates (if any) are available to Value Call under similar filed tariffs. *See MCI Telecomms. Corp. v. Teleconcepts, Inc.,* 71 F.3d 1086, 1104 (3d Cir. 1995) ("Where the subject matter is within an agency's jurisdiction and where it is a complex matter requiring special competence, with which the judge or jury would not or could not be familiar, the proper procedure is for the court to refer the matter to the appropriate agency .... Where, on the other hand, the matter is not one peculiarly within the agency's area of expertise, but is one which the courts or jury are equally well-suited to determine, the court must not abdicate its responsibility.") (citing *Elkin v. Bell Telephone Co.,* 491 Pa. 123, 420 A.2d 371, 377 (1980)).

## Conclusion

The statute of frauds explicitly requires an agent to have written authorization to bind its principal. Value Call cites no evidence that Archer or Long had written authorization from their principal, MCI. Accordingly, Value Call's counterclaims and defenses to MCI's claims—to the extent that they rely on the parties' agreements—are defeated by the statute of frauds. Moreover, even if the agreements satisfied the statute of frauds, overwhelming precedent concerning the filed rate doctrine establishes that a telecommunications carrier may charge no more and no less than its filed rate, and its customer may pay no more and no less than the filed rate. Consequently, where a carrier seeks payment based on a filed tariff, the customer may not avoid the tariff rate. This is true even if the customer and the carrier have validly executed a written agreement for a rate more favorable than that contained in the tariff. This is true even if the carrier induces the customer to sign the agreement through fraud and misrepresentation. Despite the sometimes harsh and seemingly merciless effect of this doctrine, courts have not wavered in its application. Indeed, in the context of the ICA, the Supreme Court has explicitly recognized that strict adherence to the filed rate is necessary to enforcement of the regulatory Act. *Maislin*, 497 U.S. at 132, 110 S.Ct. at 2769. As a matter of equity, Value Call's arguments may be well taken. Nonetheless, this Court is bound by prior authority. As the Fourth circuit has noted:

> [The telecommunications customer]'s problem is that while it may have equity on its side, the law is against it. The general case law is that a regulated carrier must charge the tariff rate established with the appropriate regulatory agency, even if it has quoted or charged a lower rate to its customer .... To do otherwise would be giving a preference to and discriminating in favor of the customer in question .... [A] customer does not have a claim for relief against a carrier even if the latter's representation as to applicable rates is fraudulent.

*Marco*, 875 F.2d at 436 (citations omitted).

**IT IS THEREFORE ORDERED** that *Plaintiff's Motion for Partial Summary Judgment* (Doc. #125) be and hereby is **SUSTAINED** as to plaintiff's claim that the purported agreements between MCI and Value Call are ineffective to modify rates and credits established under FCC Tariff No. 1; and **SUSTAINED** as to plaintiff's claims for nonpayment by defendant; and **SUSTAINED** with respect to defendant's counterclaims for breach of contract, for violation of the Federal Communications Act, and for fraud and misrepresentation.

**IT IS HEREBY FURTHER ORDERED** that the parties on or before November 21, 1997, file any stipulations concerning the amounts to which MCI is entitled under this order.