**PHILLIPS PIPE LINE COMPANY, Plaintiff–Appellee,**

v.

**DIAMOND SHAMROCK REFINING AND MARKETING COMPANY, Defendant–Appellant.**

No. 94–5096.

United States Court of Appeals, Tenth Circuit.

March 17, 1995.

John A. Burkhardt, Boone, Smith, Davis, Hurst & Dickman, Tulsa, OK (L.K. Smith, Boone, Smith, Davis, Hurst & Dickman, Tulsa, OK; and Don L. Jemison and Kenton J. Mai, Bartlesville, OK, with him on the brief), for plaintiff-appellee.

Bernard A. Foster, III, Ross, Marsh & Foster, Washington, DC (Deborah A. Carpentier, Ross, Marsh & Foster, Washington DC; Charles H. Fleischer, Marsh, Fleischer & Quiggle, Bethesda, MD; and Richard P. Hix and Steven K. Metcalf, Doerner, Stuart, Saunders, Daniel, Anderson & Biolchini, Tulsa, OK, with him on the briefs), for defendant-appellant.

Before MOORE and TACHA, Circuit Judges; and ALSOP, Senior District Judge.*

JOHN P. MOORE, Circuit Judge.

The issue presented by this appeal is whether Phillips Pipe Line Company and Diamond Shamrock Refining and Marketing Company have entered into an agreement for the transportation of product through a pipeline subject to the terms of the Interstate Commerce Act, which governs interstate oil pipelines. 49 U.S.C. §§ 1 *et seq.* The question is whether this regulatory scheme embodied by the filed rate doctrine supersedes a portion of the agreement relating to the lease of pipeline capacity by requiring Phillips to charge Diamond Shamrock Phillips' filed tariff rather than the lease rate in the agreement. The district court, resolving cross motions for summary judgment, held it

* The Honorable Donald D. Alsop, Senior District Judge for the United States District Court for the District of Minnesota, sitting by designation.

did. Because we believe the agreement creates valid periodic leases of the ownership interests in the pipeline under which the lessee is a carrier, not a shipper, the Phillips' tariff does not apply. Thus, we disagree with the conclusion reached by the district court and reverse.

## I.

Phillips and Diamond Shamrock are co-owners of undivided interests in the throughput capacity[1] of the Colorado Products Pipeline (Pipeline), an interstate pipeline which begins in Hutchinson County, Texas, traverses parts of Oklahoma and Colorado, and terminates near Stapleton Airport in Denver. Although their percentages of ownership vary in different segments of the Pipeline, Phillips owns approximately seventy percent and Diamond Shamrock owns the balance. More importantly, to the extent of their ownership interests, Phillips and Diamond Shamrock are common carriers for product transported in the portion of the capacity each owns. Consequently, each has filed tariffs with FERC. These facts become essential in our resolution of the issues of this case.

Notwithstanding each party is a carrier of product in accordance with its ownership interests, Phillips is the operator of the Pipeline. This responsibility requires Phillips to manage the daily operations of all pump stations, terminals, and Pipeline facilities.

The relationship between the parties was memorialized initially in 1946 by Phillips' and Diamond Shamrock's predecessor companies in an agreement which they amended in 1971 (the Agreement). Denominated a contract "to construct, maintain and operate a petroleum products pipeline system," the Agreement provided Phillips and Diamond Shamrock would convert certain existing six-inch segments of the Pipeline into a uniform eight-inch system. Integral to that contract was the establishment of a formula for their respective capital commitments and resulting ownership interests. In part, the different ownership interests resulted from Phillips'

providing the majority of capital to effect improvement of the Pipeline.

Article VI of the Agreement addressed the "Use of Pipeline Capacities by Parties" and provided in Section 1 that each party was entitled to use its throughput capacity and should not accept additional capacity that would exceed its authorized barrels per day. However, Section 2 of Article VI (the Lease) stated, in part:

> If, during the term of Agreement, commencing April 1, 1972, either party has additional space (throughput capacity) in said system out of McKee that it does not plan to utilize during any month, such party shall notify the other party thereof on or before the 24th day of the month preceding and the other party may elect to lease all or any part of such additional space by giving notice thereof on or before the 26th day of the month preceding. At the end of each such month that a party elects to lease such additional space the lessor party shall invoice the lessee party at the rate of $.15 per barrel for all space so leased. The lessee party shall make payment to the lessor party for such rental within 15 days after receipt of invoices.

Stripped of its turgid syntax, the Lease states if either party determined it would not utilize its throughput capacity, the other party could have access to it, following the procedure for notification and payment. Routinely, Phillips' and Diamond Shamrock's pipeline schedulers communicated, Phillips' attempting to determine what the respective nominations of capacity would be so that all capacity was utilized. Because maximizing capacity is an important element of the Pipeline's profitability, each party took advantage of the Lease.

In 1990, however, Phillips rejected Diamond Shamrock's tender of the Lease payment for the excess capacity it used on the ground that payment "may be in violation of the Interstate Commerce Act and could subject Phillips to enforcement action by the

---

**1.** One definition of throughput capacity is "the volume or quantity of gas delivered under all jurisdictional and non-jurisdictional services rendered by a pipeline, typically for a 12–month period." 5 David J. Muchow & William A. Mogel, *Energy Law and Transactions*, GL–143 (1994).

Federal Energy Regulatory Commission or a lawsuit by another shipper." Phillips explained that although Diamond Shamrock had been the only shipper to use the excess capacity in the 1970's, by the 1980's other shippers began to use the Pipeline and would not tolerate the rate discrimination between Phillips' tariff on file with FERC and the "modest 15¢ per barrel charge to Diamond Shamrock." This action to collect its tariff followed.

Resolving the key legal issue presented upon cross motions for summary judgment, the district court found "Diamond Shamrock utilized Phillips' idle capacity in a shipper-carrier relationship" and, therefore, Phillips' filed rate applied notwithstanding the Lease provision. To reach this conclusion, the district court relied on analogous railroad/motor carrier case law, a closer fit, it believed, than Natural Gas Act cases.

Phillips fortifies this result on appeal by characterizing the Lease as a sham contrived by the parties to evade its filed rate. Bereft of the indicia of a true lease in which there is a definite term and the liability for payment whether or not the capacity is used, this Lease, Phillips contends, fosters discriminatory and preferential rates which the filed rate doctrine was designed to eliminate. By looking instead at the substance of the Lease, and not its form, Phillips urges the filed rate doctrine trumps its terms.

Diamond Shamrock, however, contends the district court erroneously condensed the separate and specific roles each party plays to conclude a shipper-carrier relationship exists, mandating the application of the filed rate doctrine. Instead, it states, the Lease conveys a genuine leasehold estate triggered by Phillips' notifying Diamond Shamrock of its excess capacity. Upon its acceptance and obligation to pay for all space leased, Diamond Shamrock states it becomes a carrier of the product to be shipped during the Lease period, pays Phillips $.15 per barrel plus operating expenses for its use of the space, and charges its subsidiary Diamond Shamrock's own filed rate, which it is bound to do as a common carrier. Thus, it distinguishes, Diamond Shamrock utilizes Phillips' excess capacity along with its "owned capaci-

ty," to transport its product. Diamond Shamrock urges Phillips' characterization of the Lease as a sham is a red herring. The parties bargained for this provision to ensure full utilization of the Pipeline at all times, it insists.

## II.

■ The filed rate doctrine, which originated in the Supreme Court's cases interpreting the Interstate Commerce Act, "forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority." *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577, 101 S.Ct. 2925, 2930, 69 L.Ed.2d 856 (1981) (citation omitted). The Hepburn Act of 1906, 34 Stat. 589 (1906), specifically extended the ICA to "common carriers engaged in . . . [t]he transportation of oil . . . by pipe line." 49 U.S.C. § 1(1)(b). Thus, "extended across the spectrum of regulated utilities," *Arkansas Louisiana Gas*, 453 U.S. at 577, 101 S.Ct. at 2930, the filed rate doctrine serves "to assure effective Commission oversight of the rates at which power is sold. 'The considerations underlying the [filed rate] doctrine . . . are preservation of the agency's primary jurisdiction over reasonableness of rates and the need to insure that regulated companies charge only those rates of which the agency has been made cognizant.'" *City of Girard, Kan. v. FERC*, 790 F.2d 919, 922 (D.C.Cir.1986) (quoting *City of Cleveland v. FPC*, 525 F.2d 845, 854 (D.C.Cir.1976)). Consequently, this case turns upon whether the relationship between the parties is that of shipper and carrier or lessee and lessor.

■ Phillips' tariff would apply only if the Lease results in Phillips becoming the carrier of product shipped by Diamond Shamrock. Alternatively stated, only shippers are required to pay the filed rate under the tariff. The district court found the shipper-carrier relationship existed, accepting Phillips' characterization that Diamond Shamrock leases the excess capacity as a shipper subject to pay the filed tariff. We think this conclusion misconstrues the nature of the Agreement.

Reduced to its fundament, the Agreement is an arrangement in which the parties agreed Phillips would pay the largest portion of the cost of upgrading the Pipeline, receiving in turn a larger share of the ownership. Recognizing the economic need to keep the Pipeline filled, the parties also agreed to means by which either could use the other's anticipated excess capacity for any given month. The vehicle chosen for that purpose was a one-month tenancy, the terms of which are wholly consistent with conditions of a true lease. The tenancy that resulted, however, resulted in the lessee's becoming a carrier, not a shipper. We ground our conclusions on several factors.

First, Phillips and Diamond Shamrock are co-owners of the Pipeline. Each is an undivided owner and a common carrier with its respective filed tariffs for the product shipped in its portion of the Pipeline capacity.

Second, the Lease allows for an adjustment of the right to use portions of the Pipeline capacity in monthly segments resulting in variable interests in the total capacity. While the Agreement creates basic rights to transport product which are tethered to the co-ownership of the line, the Lease makes periodic adjustments to those rights.

Third, any lease arising from Section 2 has fixed obligations and terms. During the life of the Agreement, if either party provides notification of its anticipated unused capacity, the other must respond by a fixed date. While the amount of the anticipated excess capacity may vary each month, thus affecting the total rent that must be paid, the Lease term is a constant period: one month. Moreover, the lessee incurs the risk of payment "for all space so leased," regardless of whether the entire excess capacity is actually used. Thus, for example, Diamond Shamrock's nomination of the space entitles it to acquire possession of a fixed capacity during that designated month's term and obligates it to pay for that space.

Fourth, no other entity, including a party to the Agreement, would have a right to the excess capacity once acceptance is given under Section 2. Of course, as apparently has occurred since adoption of the Lease, if a party does not accept the excess capacity following notice, the other is free to offer it to any shipper, consistent with the offeror's tariff.

Fifth, in actual practice, Diamond Shamrock Refining and Marketing Company, the carrier, charged Diamond Shamrock, Inc., the shipper, the Diamond Shamrock filed rate for product shipped through the Diamond Shamrock thirty percent portion of the Pipeline. This same charge was levied when additional capacity was obtained under the Lease, thus maintaining Diamond Shamrock's identity as a carrier, no matter how much of the Pipeline it used for this purpose.[2]

■ In the last analysis, we perceive no difference between the parameters of this Lease and others offered by Phillips to illustrate so-called true leases. *See, e.g., Phillips Pipe Line Co.*, 65 F.E.R.C. ¶ 62,089 (1993).[3] Nor does an analogy to commercial or bankruptcy law differ. *See, e.g., American Standard Credit, Inc. v. National Cement Co.*, 643 F.2d 248, 260–61 (5th Cir.1981). Indeed, courts have frequently been called upon to analyze commercial relationships to determine whether they were leases or otherwise, and have employed recognized tests to make the distinction. Lawrence F. Flick, *Leases of Personal Property*, 45 Bus.Law. 2331 (1990); George P. Haley & R.J. Spjut, *When is an Equipment Lease a Security Agreement Under the Uniform Commercial Code*, 503 PLI/ Comm. 139 (1989). Generally, indicia, such as whether there is a fixed term after which the lessor has a residual interest, whether

2. Daniel Crabb, Diamond Shamrock's accountant for the Pipeline, asked whether he viewed the transaction as a shipment at $.15 a barrel, stated, "I view it as the pipeline group leasing the space from Phillips and paying 15 cents and paying the expenses, and then I'm turning around and collecting my tariff from the shipper." Diamond Shamrock's tariff is $.50 per barrel from McKee to La Junta, and $.70 per barrel from McKee to Denver.

3. In that case, Sinclair protested Phillips' filed tariff for a portion of throughput capacity Phillips temporarily leased from ARCO. Sinclair did not question the lease itself but protested the tariff Phillips filed as unjust and unreasonable.

there is a fixed obligation for the right of possession, or whether the lessee acquires any equity interest in the leased property are all guidelines to assist in resolving the true lease versus sham lease question. If the lessor retains the residual interest and the lessee acquires no equity, the agreement is generally regarded as a true lease.

Using those guidelines, we believe the facts of this case establish a true lessor-lessee relationship. Most importantly, however, the facts also negate any assumption the lessee became a shipper of product by execution of the Lease. That assumption erroneously disregards the nature of the estate vested in the lessee as a consequence of the Lease. Thus, the stipulated legal question before the district court whether Phillips is lawfully entitled to collect its tariff rate for the shipments at issue irrespective of the Agreement between the parties merits a negative answer. Without torturing the meaning of words or playing semantic games, Diamond Shamrock transports product in the excess throughput capacity it leases. Its own filed rate governs those shipments.

Finally, we must lay to rest Phillips' contention the Lease is a sham created to avoid the filed rate doctrine. Assuredly, there is no direct evidence that supports such a contention. Indeed, Phillips' suggestion grows from an acknowledgment by a Diamond Shamrock executive that his company received an economic benefit by being able to acquire the excess capacity at less than Phillips' tariff. Yet, given the context of Diamond Shamrock's practice, his statement merely reflects upon the commercial value of being able to lease pipeline capacity at the rate of $.15 per barrel, and it does not pertain to a shipper's reflection upon the reduced cost of shipping. Were it otherwise, Diamond Shamrock's charge of its own tariff to its related entity actually shipping product would be economically foolish.

Of course, this resolution also addresses Phillips' seeming afterthought that the Lease nevertheless violates the ICA's concomitant prohibitions against undue preferences or prejudice. Phillips alleged during the 1980s

more third-party shippers wanted to utilize the Pipeline, mandating it make the space available equally. The Lease, it contends, violates the ICA by giving Diamond Shamrock a preference as a shipper under a discriminatory tariff. The response, of course, is the Lease does not make Diamond Shamrock a shipper.

On the record before us, then, we hold the filed rate doctrine does not trump the terms of the Lease. This conclusion necessarily revitalizes Diamond Shamrock's counterclaim Phillips breached the terms of Article VI by failing or refusing to provide notification of its monthly excess capacity.[4] Not only does the Lease govern the relationship of the parties, but also each of its provisions as bargained for retains its validity. We, therefore, **REVERSE** the district court's order granting summary judgment in favor of Phillips and **REMAND** for the district court to enter judgment for Diamond Shamrock.

4. Our conclusion also resolves the question of attorney fees the district court awarded, and

Diamond Shamrock appealed. We would note, however, Phillips conceded the error in its brief.