# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 24, 2011

No. 09-60947

Lyle W. Cayce
Clerk

WESTERN REFINING SOUTHWEST, INC.; WESTERN REFINING
PIPELINE COMPANY,

Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION; UNITED STATES OF
AMERICA,

Respondents.

On Petition for Review of an Order of the
Federal Energy Regulatory Commission

Before DeMOSS, BENAVIDES, and ELROD, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge.

The Interstate Commerce Act vests the Federal Energy Regulatory Commission with jurisdiction over common carriers engaged in "the transportation of oil . . . by pipe line." 49 U.S.C. app. § 1(1)(b) (1988). This case concerns the extent of the Commission's jurisdiction under the Act, and whether it includes a dispute over a capacity lease agreement regarding the use of an oil pipeline. We AFFIRM.

No. 09-60947

I.

This case arises from a contractual dispute between Western Refining Southwest, Inc., Western Refining Pipeline Company (collectively, Western) and Enterprise Crude Pipeline, LLC, formerly known as TEPPCO Crude Pipeline, LLC (Enterprise). In order to transport crude oil to its refineries, Western[1] entered into a capacity lease agreement with Enterprise. Under the capacity lease agreement, Western would lease capacity on Enterprise's pipeline between Midland, Texas and Hobbs, New Mexico. The agreement also required Enterprise to set aside sufficient capacity in its pipeline to enable Western to transport 15,000 barrels a day of crude oil from Midland, Texas to Hobbs, New Mexico. The agreement set out a monthly rental payment system, whereby Western would be required to pay for base capacity on the pipeline at a set rate, regardless of whether Western used the base capacity in a given month.

Enterprise also agreed to construct a new pipeline between Hobbs, New Mexico and Lynch, New Mexico. Moreover, as part of the overall arrangement, Western contracted to purchase a minimum of 10,000 barrels of crude per day from Enterprise for the first two years, with declining requirements over the length of the agreement. The agreement states that Texas law governs any dispute over the interpretation, validity, or performance of the lease. The agreement became effective in June 2007 for a ten-year term.

Significantly, the capacity lease agreement expressly states that Western "shall use its Leased Capacity in the Pipeline solely as an individual common carrier facility. [Western] shall separately maintain tariffs in its own name in accordance with any applicable state and federal laws and regulations . . . .

---

[1] Western's predecessor, Giant Pipeline Company, actually entered into the capacity lease agreement with TEPPCO, Enterprise's predecessor. For the purposes of this opinion, we will refer to both Giant and the Western parties as "Western" and TEPPCO and Enterprise as "Enterprise."

No. 09-60947

[Enterpise] shall not be an agent for [Western] in connection with acceptance of tenders from shippers for shipment of crude oil." That is, Western agreed to act as the common carrier for the leased capacity in the pipeline and maintain tariffs with the Commission for that purpose. In accordance with the agreement, Western filed a request with the Commission for waiver of the Act's tariff filing and reporting requirements on the ground that its affiliate would be the only shipper on the leased capacity. The Commission granted the waiver.[2]

The capacity lease agreement required Western to notify Enterprise, by the 25th day of each month, of its planned transportation activity in its leased capacity for the following month. In May 2008, Western failed to notify Enterprise of any transportation activity for June 2008. Therefore, Enterprise decided to use Western's leased capacity in the Midland, Texas-to- Hobbs, New Mexico pipeline for its own benefit and reversed the flow of the line. To facilitate this change, Enterprise pumped the line fill belonging to Western into a storage tank in Midland, Texas. In response to Enterprise's actions, Western sought to pull 46,200 barrels from its inventory on the Enterprise pipeline system. Enterprise advised Western that it could pull 20,200 barrels from the system but that the remainder (26,000) was the required minimum inventory under the agreement. Throughout 2008, Western continued to pay the monthly rental fee under the agreement.

On February 9, 2009, Western filed a complaint against Enterprise before the Commission. The complaint explained that Western had contracted with Enterprise to lease capacity on Enterprise's pipeline facilities. Western alleged

---

[2] Subsequently, Western, after acquiring Giant, filed tariffs with the Commission to provide common carrier transportation from Texas to New Mexico. In its filing, Western described the system as consisting of its own pipeline from Lynch to Bisti and the leased capacity from Enterprise from Midland to Lynch.

No. 09-60947

that Enterprise acted in an unjust, unreasonable manner, thereby violating §
1(6) of the Act, by reversing the flow of one of the pipelines at issue and illegally
retaining crude oil belonging to Western, while continuing to collect lease
payments. Further, Western asserted that Enterprise failed to provide any
notice that it was reversing the line or that it was diverting Western's line fill
to an Enterprise storage tank. Western sought damages under § 8 of the Act,
which provides that a "common carrier shall be liable to the person or persons
injured thereby for the full amount of any damages sustained in consequence
of any violation of the provisions of this chapter."

The Commission determined that the allegations in the complaint did not
invoke "the Commission's jurisdiction over oil pipeline transportation," but
rather arose from "a private contract governing property rights that is solely
within the jurisdiction of the appropriate state court to resolve." Western
sought rehearing, which the Commission denied. The Commission reaffirmed
its earlier decision, noting that "the contract in question is for the lease of
pipeline facilities and not for the 'transportation of oil,' [and therefore] the
Commission has no jurisdictional authority [under the Act] over the contractual
dispute between [Western and Enterprise]." The Commission also stated that,
even if it had jurisdiction under the Act, it would decline to exercise jurisdiction
over the contractual claims because no primary jurisdiction exists in this case.

## II.

Before we review the Commission's order on appeal, we must first address
the Commission's ripeness argument. The Commission asserts that the current
appeal is not ripe for review because the outcome of ongoing state proceedings
between the two parties may obviate the need for federal appellate review of the
jurisdictional issue raised in the petition. In evaluating the ripeness of a claim,
a court must "evaluate both the fitness of the issues for judicial decision and the

No. 09-60947

hardship to the parties of withholding court consideration." *Abbott Labs v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

This appeal concerns the scope of the Commission's jurisdiction under the Interstate Commerce Act. That issue is not being considered by any state court, including the state court that is hearing Enterprise's complaint against Western. Here, the Commission considered its jurisdiction and that issue is properly and squarely before this court on appeal. Thus, it is fit for judicial decision. In addition, Western would suffer hardship by not having access to a judicial forum to review the adverse agency action in question. *See Abbott Labs*, 387 U.S. at 156.

Several other circuits have rejected similar ripeness arguments. The Ninth Circuit, addressing the Commission's jurisdiction on appeal, rejected the Commission's request that it dismiss the appeal on ripeness grounds, stating that "[i]t is difficult to postulate an issue more proper for judicial decision than that of the statutory authority of an administrative agency." *See Cal. State ex rel. Water Res. Control Bd. v. Fed. Energy Regulatory Comm'n*, 966 F.2d 1541, 1562 (9th Cir. 1992). The Eighth Circuit, considering the authority of a state public utility commission over a contract between the utility and a nuclear power plant, rejected a similar ripeness argument: "[t]his argument again ignores the true nature of the relief sought. [Middle South Energy] challenges not the state's ultimate substantive decision but its authority to even conduct the contemplated proceeding." *See Middle S. Energy, Inc. v. Ark. Pub. Serv. Comm'n,* 772 F.2d 404, 410 (8th Cir. 1985). The First Circuit rejected a similar ripeness argument where a concurrent state proceeding was considering a contractual issue relating to the claim on appeal: "[t]he pending state court proceeding does not render the present case unripe. Even if we focus only on the Contracts Clause claim—most of PSNH's claims concern other matters—the state court's view of the agreement

No. 09-60947

would not necessarily resolve the federal constitutional issue." *See Pub. Serv. Co. of N.H. v. Patch,* 167 F.3d 15, 23-24 (1st Cir. 1998). Thus, this case is ripe for review. We now turn to whether the Commission has jurisdiction under the Act.

III.

At issue here is whether the Commission has jurisdiction over Western's claims under the Act—specifically, claims that Enterprise acted unreasonably and unjustly by (1) reversing the flow of the pipeline and using Western's leased capacity and (2) by seizing Western's crude oil and diverting it to an Enterprise storage tank. In analyzing the Commission's interpretation of its statutory authority under the Act, we apply *Chevron*'s[3] two-step analysis. *See, e.g., El Paso Elec. Co. v. Fed. Energy Regulatory Comm'n*, 201 F.3d 667, 669-70 (5th Cir. 2000) (applying *Chevron* deference to the Commission's determination of its statutory authority under the Federal Power Act); *Pac. Gas & Elec. Co. v. Fed. Energy Regulatory Comm'n*, 106 F.3d 1190, 1196 (5th Cir. 1997) (applying *Chevron* deference in assessing whether "FERC imposed a reasonable construction on the description of its statutory powers" in the Natural Gas Act).

Under the first step, if Congress "has spoken directly on the precise question at issue," the Court "must 'give effect to [Congress'] unambiguously expressed intent.'" *Tex. Office of Pub. Util. Counsel v. Fed. Commc'ns Comm'n*, 265 F.3d 313, 320 (5th Cir. 2001) (quoting *Chevron*, 467 U.S. at 843). If Congress has not spoken directly, however, the court moves to the second step of *Chevron* and assesses "whether the agency interpretation is a 'permissible construction of the statute.'" *La. Envtl. Action Network v. U.S. Envtl. Protection Agency*, 382 F.3d 575, 581-82 (5th Cir. 2004) (quoting *Chevron*, 467 U.S. at 843). If the agency's interpretation is permissible, "[d]eference is warranted" so long as the agency's construction is not arbitrary, capricious, an abuse of discretion, or otherwise not

---

[3] *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

No. 09-60947

in accordance with law. *Id.* at 582; *see also Ass'n of Oil Pipe Lines v. Fed. Energy Regulatory Comm'n*, 83 F.3d 1434, 1440 (D.C. Cir. 1996) ("the court has no occasion to assign a meaning to the [Interstate Commerce Act] where that meaning would contravene a reasonable interpretation by the [Commission, which is] responsible for administering the statute"). We begin, as we must, with the text of the statute. *See, e.g., Kerr-McGee Oil & Gas Corp. v. U.S. Dep't of Interior*, 554 F.3d 1082, 1084 (5th Cir. 2009) (citation omitted).

IV.

Congress passed the Interstate Commerce Act in 1887 to regulate railroads, and simultaneously created the Interstate Commerce Commission to administer the statute. Ch. 104, 24 Stat. 379 (1887). The Hepburn Act of 1906, Pub. L. No. 59-337, § 1, 34 Stat. 584,  specifically extended the Interstate Commerce Act to "common carriers engaged in. . . [t]he transportation of oil . . . by pipeline." 49 U.S.C. app. § 1(1)(b) (1988). In 1977, Congress transferred the Interstate Commerce Commission's authority over oil pipelines to the newly-created Federal Energy Regulatory Commission. Department of Energy Reorganization Act, Pub. L. No. 95-91, § 402(b), 91 Stat. 565 (codified at 49 U.S.C. § 60502). The next year, Congress repealed much of the Interstate Commerce Act, but provided that transportation of oil by pipeline companies would be subject to "[t]he laws . . . as they existed on October 1, 1977." Act of Oct. 17, 1978, Pub. L. No. 95-473, § 4c, 92 Stat. 1337, 1470.[4]

The Act enacts a regulatory scheme prohibiting discriminatory, unjust, and unreasonable practices by common carriers concerning rates, fares, charges,

---

[4] As noted by the Commission, the 1977 version of the Act is no longer reprinted in the appendix to title 49 of the United States Code. Accordingly, citations to the Interstate Commerce Act are to the 1988 edition of the U.S. Code, which is the last edition that reprinted the Interstate Commerce Act as it appeared in 1977. *See, e.g., Frontier Pipeline Co. v. Fed. Energy Regulatory Comm'n*, 452 F.3d 774, 776 (D.C. Cir. 2006) (explaining the history of oil pipeline regulation under, and unusual citation to, the Interstate Commerce Act).

and classifications. For instance, all common carriers must file and publish reasonable, nondiscriminatory rates subject to regulatory approval, avoid imposing unjust and unreasonable tariff terms and conditions upon shippers, *see, e.g.*, 49 U.S.C. app. §§ 1(5), 3(1), 4(1), and 6, and file certain financial reports and follow certain accounting procedures, *id.* §§ 20(1), (2), (4), and (5). However, pipeline companies are not subject to all of the provisions applicable to rail carriers. In particular, they are not subject to the regulation of market entry and exit under sections 1(18) and 1a, or acquisitions of control (including that accomplished through leases) under sections 5(2)-(13). *See id.* § 5 (14) (defining "carrier" for purposes of provisions regarding unifications, mergers, and acquisitions of control to mean "a carrier by railroad . . . a motor carrier . . . and a water carrier," and specifically omitting oil pipelines).

Therefore, unlike the Federal Power Act, and the Natural Gas Act, which both provide for regulations regarding leases of their respective industries, *see* 16 U.S.C. § 824b(a)(1)(A) (providing that no FERC-regulated utility "shall sell, lease, or otherwise dispose of" or "acquire" facilities "without first having secured an order of the Commission authorizing it do so"), and 15 U.S.C. §§ 717f(b), (c) (parties seeking to enter into lease agreements involving natural gas facilities must obtain from the Commission a certificate of public convenience and approval of abandonment), there are no such comparable provisions applicable to oil pipeline capacity leases. Although Section 5(2) of the Act discusses the regulatory approval process applicable to the acquisition of a carrier's property by "purchase, lease or contract to operate," that section does not apply to oil pipeline companies. *See* 49 U.S.C. app. §§ 5(2), 5(14).

Pursuant to the Act, Pipeline companies file tariffs with the Commission, and shippers pay rates, as listed in the tariffs, to transport oil through the pipeline. The Act broadly permits anyone to challenge pipeline rates and practices by filing a complaint with the Commission. *See* 49 U.S.C. app. § 13(1)

(providing for complaints against common carriers).  Section 15(1) of the Act permits the Commission, after determining that a practice "is or will be unjust or unreasonable," to "prescribe . . . what . . . practice is or will be just, fair, and reasonable, to be thereafter followed . . . ." *Id.* § 15(1).  Common carriers who are found to have violated the Act "shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation . . . ." *Id.* § 8.

Under the Act, the Commission has jurisdiction over "common carriers . . . engaged in . . . [t]he transportation of oil . . . by pipe line."  Common carrier is defined by the Act: "The term 'common carrier' as used in this chapter shall include all pipeline companies . . . engaged in such transportation as aforesaid as common carriers for hire."  49 U.S.C. app. § 1(3).  Transportation is defined to include:

> locomotives, cars, and other vehicles, vessels and all instrumentalities, and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof, and all services in connection with the receipt, delivery, elevation, and transfer in transit . . . and handling of property transported.

49 U.S.C. app. § 1(3)(a).

The text of the statute is clear: the Commission has jurisdiction over common carriers engaged in the transportation of oil.  Therefore, the question of whether the Commission has jurisdiction over the dispute between the parties turns on whether, under these facts, Enterprise was acting as a common carrier when it leased capacity on its pipeline to Western.

The capacity lease agreement sets out the rights and obligations of the two parties in this dispute.  The agreement allows Western to lease capacity in an oil pipeline owned by Enterprise.  Under the agreement, Western, the lessee, "shall use its Leased Capacity in the Pipeline solely as an individual common carrier facility.  Lessee shall separately maintain tariffs in its name in accordance with

any applicable state and federal laws and regulations covering the Leased Capacity and shall collect for its own account all revenues payable by shippers under such tariffs." Pursuant to this provision in the agreement, Western's predecessor, Giant, sought a waiver of the tariff filing and reporting requirements imposed by the Act for transporting oil through the leased capacity in the pipeline. The Commission granted the waiver in light of the representation that the only shipper using the leased capacity would be an affiliate, Giant Industries Arizona. The Commission explained, however, that if Giant (Western) received a request for transportation from an unaffiliated shipper, it would have to file "a tariff with the Commission for movements over its leased capacity." After Western acquired Giant, Western filed tariffs in order "to establish common carrier service between the Midland, Texas origin; and Star Lake and Bisti, New Mexico destinations." The tariff included transportation on the leased capacity.

At no time did Western or its affiliate shipper pay fees for use of the oil pipeline based on Enterprise's tariff filings with the Commission. Rather, Western had a monthly rental fee arrangement with Enterprise, which allowed Western to lease "sufficient capacity in the Pipeline to transport 15,000 barrels per day of crude oil." The relationship between Enterprise and Western is a lessor/lessee arrangement. Not only did the agreement between the two parties expressly contemplate a monthly fee arrangement instead of rates paid under a tariff filing, it is not even clear that a lessor's tariff would apply to a lessee, where the parties had negotiated a different rate in their capacity lease agreement.

The Tenth Circuit addressed a similar issue in *Phillips Pipe Line Co. v. Diamond Shamrock Ref. & Mktg. Co.*, 50 F.3d 864, 867-68 (10th Cir. 1995). In that case, Phillips and Diamond were co-owners of a pipeline, with Phillips having seventy percent of the capacity and Diamond having thirty percent. Under the terms of their lease, if either party had additional space in their respective capacity, that party would notify the other party and allow it to lease

No. 09-60947

that unused capacity at a fixed rate. *Id.* at 868. The fixed rate in the lease was considerably lower than Phillips' tariff rate and subsequently, Phillips contended that the agreement violated the Act because it discriminated in favor of Diamond over other shippers who were willing to use Phillips' excess capacity. *Id.* at 866-67. The Tenth Circuit held that the filed rate doctrine, which forbids a regulated entity to charge rates for its services other than those properly filed with a federal agency, did not apply because Diamond was not a shipper but a common carrier and a lessee. *Id.* at 867. Therefore, the Act's provisions did not supercede the agreement's provisions because the agreement did not implicate the transportation of oil under the Act but contractual rights between a lessor and lessee. *Id.* at 869.

Similarly, Western is not a shipper paying tariff rates to a common carrier, Enterprise, in order to transport oil through the pipeline, but a common carrier and a lessee. In fact, the agreement could not be more unequivocal—Western "shall use its Leased Capacity in the Pipeline solely as an individual common carrier facility." Enterprise is not acting as a common carrier vis-a-vis Western but as a lessor that has agreed to lease capacity to Western, the lessee. Western's claims against Enterprise are actionable under the Act only if Enterprise is a common carrier. Because Enterprise is not a common carrier, the Commission correctly held that it had no jurisdiction over Western's claims and this dispute.

Western contends that its claims concern the transportation of oil, and that section 1(3) of the Act, which defines transportation, includes the following clause: "irrespective of ownership or of any contract." Therefore, according to Western, because Enterprise is the owner of the pipeline, any entity that is involved in the transportation of oil on its pipeline, including a lessee acting as a common carrier in its own right, may file claims against Enterprise under the

11

No. 09-60947

Act.  We are not persuaded.[5]  Contrary to Western's contention, the clause does not create common carrier duties where they would not normally exist.  Even absent any contractual agreement between Western and Enterprise, no common carrier relationship exists.  Western's affiliate shipper is not paying rates to Enterprise according to Enterprise's tariff with the Commission, but is instead paying rates to Western according to Western's tariff.   Enterprise is not a common carrier, and the language of the clause does not affect its status in any way.

Rather than creating a common-carrier relationship, the clause ensures that parties cannot contract out of common carrier liability under the Act by stating that, for example, they do not own the pipeline but are merely leasing it. Thus, under the clause, Western, who is acting as a common carrier, and is required to file a tariff with the Commission for its leased capacity, cannot evade common carrier liability by claiming that it is not the owner of the pipeline but only a lessee.  As such, if Western was engaging in discriminatory practices against a shipper, that shipper could bring an action against Western under the Act.

Our interpretation of the Act is consistent with congressional intent. Congress originally passed the Act to combat the "evil of discrimination."  *See Louisville & N.R. Co. v. United States*, 282 U.S. 740, 749 (1931) (citations omitted). In particular, Congress sought to eliminate the preferential rates given by railroad companies to certain shippers by declaring such discrimination

---

[5] We note that the statute's text, as discussed above, does not include any provisions regulating capacity leases with oil pipeline companies, and in fact, omits oil pipeline companies from such regulation, although they are included in other sections of the statute. *Compare* 49 U.S.C. app. § 5(14) *with* 49 U.S.C. app. §§ 1(5), 3(1), 4(1), and 6.  Indeed, the D.C. Circuit has stated that "pipeline companies have none of the special obligations imposed upon vehicular regulatees under the Act," indicating "a congressional intent to allow a freer play of competitive forces among oil pipeline companies than in other common carrier industries." *Farmers Union Cent. Exch., v. Fed. Energy Regulatory Comm'n*, 584 F.2d 408, 413 (D.C. Cir. 1978).

No. 09-60947

unlawful and requiring railroads to publish their tariffs. *Fl. E. Coast Ry. Co. v. City of W. Palm Beach,* 266 F.3d 1324, 1333 (11th Cir. 2001) (citing ICA, Ch. 104, §§ 2 & 6, 24 Stat. 379, 379-82 (1887)). Congress amended the Act in 1906, in order to broaden the definition of transportation to include cars, vehicles, and all other instrumentalities of shipment or carriage, irrespective of ownership or contract. *Id.* at 1335. This court's interpretation, that the "irrespective of ownership or contract" clause ensures that lessees such as Western, who are acting as common carriers, are subject to the Act and therefore, cannot engage in discriminatory practices, is in line with the purposes of the Act—to combat the "evil of discrimination." In sum, we hold that the plain language of the statute unambiguously states that the Act's relevant provisions only apply to common carriers, and Enterprise does not meet the statutory definition of common carrier vis-a-vis Western. Accordingly, we hold that, under the Act, the Commission does not have jurisdiction over Western's dispute with Enterprise. Because the statute's text is unambiguous, we need not proceed to Step Two of *Chevron*. *See Med. Ctr. Pharmacy v. Mukasey*, 536 F.3d 383, 392 (5th Cir. 2008).[6]

V.

Western also contends that the Act requires the Commission to conduct a hearing regarding its claims. But as the Commission notes, nothing in the Act constrains the manner in which the Commission can address complaints brought before it. Section 13(1) requires the Commission to "investigate the matters complained of" when "there shall appear to be any reasonable ground" for believing that a "common carrier" has acted "in contravention of the provisions" of the Interstate Commerce Act. 49 U.S.C. app. § 13(1). Rather than requiring the

---

[6] The Commission also held that even if it had jurisdiction under the Act, it would decline to assert jurisdiction over Western's contractual claims under the doctrine of primary jurisdiction. Because we find that the Commission lacks jurisdiction under the Act, the court need not address the issue of primary jurisdiction over Western's contractual claims. *See Ark. La. Gas Co. v. Hall*, 7 F.E.R.C. ¶¶ 61,175, 61,322-23 (1979).

No. 09-60947

Commission to set a complaint for hearing, the Act provides that the investigation shall take place "in such manner and by such means as [the Commission] shall deem proper." *Id*. The Supreme Court has firmly instructed that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA" or statute. *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990). "In general, FERC must hold an evidentiary hearing only when a genuine issue of material fact exists, and even then, FERC need not conduct such a hearing if [the disputed issues] may be adequately resolved on the written record." *Cajun Elec. Power Coop., Inc. v. FERC*, 28 F.3d 173, 177 (D.C. Cir. 1994) (internal quotation marks and citations omitted). Here, Western fails to identify any genuine issue of material fact that the Commission did not adequately address, or could not be resolved by reference to the parties' written submissions, and therefore there was no need for a hearing.

Finally, Western claims that it is "fundamentally incorrect for an adjudicative body" to resolve disputed factual issues in the context of a motion to dismiss. But it is well-established that factual issues relating to an adjudicative body's subject-matter jurisdiction may be resolved "before the adjudication of a case on its merits." *Dillon v. Rogers*, 596 F.3d 260, 271 (5th Cir. 2010). Thus, "when subject matter jurisdiction over a case turns on disputed facts," the Commission, like a district court, "[has] the power to resolve these disputes in assuring" itself of its "jurisdiction." *Id*. (citing *Wetmore v. Rymer*, 169 U.S. 115, 120-21 (1898); *Chatham Condo Ass'ns v. Century Vill., Inc.*, 597 F.2d 1002, 1012 (5th Cir. 1979)). Here, the Commission reviewed the extensive record assembled by the parties, resolved all factual issues relating to its jurisdiction to hear the dispute, and correctly concluded that it lacked jurisdiction.

14

No. 09-60947

VI.

For the foregoing reasons, we AFFIRM the Commission's order dismissing Western's claims.

AFFIRMED.